**AMERICAN SURETY COMPANY,**
Appellant,

v.

**Annie B. SEMMONS, Appellee.**

**No. 260.**

Court of Civil Appeals of Texas.

Tyler.

March 23, 1967.

Second Motion for Rehearing Denied
April 13, 1967.

Garrison, Renfrow, Zeleskey, Cornelius & Rogers, Kenzy D. Hallmark, Lufkin, for appellant.

R. W. Fairchild, Vernis Fulmer, Nacogdoches, for appellee.

## ON MOTION FOR REHEARING

DUNAGAN, Chief Justice.

The opinion heretofore rendered by this court is withdrawn and the following substituted therefor:

This is a workmen's compensation case tried to a jury in the 2nd Judicial District Court of Cherokee County, Texas, whereby the jury found that plaintiff, Annie B. Semmons, sustained an injury on or about July 18, 1963, in the course and scope of her employment for H. B. Hibberts Construction Company. The jury found that plaintiff sustained total and permanent incapacity beginning on said date.

Judgment was entered in favor of plaintiff, based upon the jury's verdict, for 401 weeks of workmen's compensation benefits at the rate of $35.00 per week and accrued medical expenses in the sum and amount of $188.00. Defendant's amended motion for new trial was overruled, and from the entry of the judgment and the overruling of defendant's amended motion for a new trial, this appeal has been brought.

In answer to Special Issues Nos. 1, 2 and 3, the jury found that plaintiff sustained an accidental injury in the course and scope of her employment for Hibberts Construction Company. The plaintiff testified that on July 18, 1963, she was picking up some broken cement and other rubbish when she felt a sting in her back. She was seen by Dr. Evans in Alto and was subsequently referred to Dr. E. L. Mahon of Jacksonville, Texas. Dr. Mahon first saw the plaintiff on April 12, 1963. He saw her on several occasions on a regular patient relationship until January of 1964, after which time he did not see her except for a pre-trial examination requested by the defendant. Dr. Mahon's diagnosis of the plaintiff's condition was a lumbar muscle strain, and it was also determined that she had a positive blood test for syphilis which indicated that at some time she had had an infection of syphilis. As of the last time that Dr. Mahon saw the plaintiff as a treating physician, which was January, 1964, there was nothing wrong with her back and no other complaints were made inconsistent with her ability to work.

Plaintiff called as a witness Dr. V. W. Pryor by deposition, and he stated that he first saw the plaintiff on February 6, 1964. He saw the plaintiff on several other occasions and on May 21, 1964, the plaintiff had a seizure in Dr. Pryor's office which was diagnosed as a central nervous system seizure resulting from third degree syphilis.

From that time forward, the plaintiff has been under the care of Dr. Pryor for central nervous system syphilis.

Dr. Pryor and Dr. Mahon were the only physicians to testify during the trial. Dr. Mahon was called as a witness by the defendant. Dr. Mahon stated there was no connection between the lumbar sacral strain and the manifestation of third degree syphilis in the plaintiff. Plaintiff offered the testimony of Dr. Pryor in an attempt to connect the condition of third degree syphilis and the back strain of the plaintiff and it is from the admission of this testimony, before the jury, that gives rise to the points now under discussion.

If there is any evidence of probative value connecting the back strain of plaintiff to the onset of third degree syphilis and its continuing effects, it is found in the testimony of Dr. Pryor. The testimony of Dr. Pryor pertaining to the causal relationship between the back strain and the onset of third degree syphilis and its continuing effects is as follows:

"'Q * * * Now, you spoke, Doctor, about the pain in the right sacro-iliac area and the generalized pain over the back and the leg and hip—also, you mentioned this terrific central nervous reaction that she was having and said big drops of sweat popped out while she was in your office having one of those reactions, how do you account for that in connection with her injury, Doctor, if you can?—If you can, explain it.

A Well, frankly, I think that was a side effect entirely.

Q Sir?

A I said, "I think that was a side effect entirely."

Q You mean different from the injury or did it happen after the injury?'

"* * *

"'A That could or it could not have had that effect in connection with the injury—

Q What is your opinion—

A —In itself, it was a—was a—I mean by that, that the injury might have aggravated it and then it could have happened possibly within the injury —it could have been that she was due in that stage with the disease and that was what was going to happen to her, see?

Q Well, that's what I am getting at, as to whether you think such reaction was coming wholly from the disease of syphilis or from her injury as playing a part in connection with the disease or wholly from the injury?'

"* * *

"'A Well, Mr. Fulmer, that would be practically impossible to absolutely state because they will do that when they haven't had any injury, they will reach that stage anyhow—whether the injury did hurry it up or not why that is purely a matter of conjecture, you see?

Q Knowing her case like you do and as you have treated her all along on an average here of once a week and sometimes more often, what is your thought, Doctor,—you want to make the best judgment on it—give the best opinion on it of the most likely correct opinion, what would you say as to whether the injury contributed in some respect to that condition of that terrific central nervous reaction that you saw her with and that she said that she had been having from time to time?

A Well, that's just—

Q If you take into consideration further the history that she gave you

that she hadn't had any such things before her injury?

A Well, there is—there is a possibility it helped hurry it up—helped precipitate it all right, but like I said before, that would be a matter of conjecture, pure and simple —it could do it—it is possible that it could do it.'

"* * *

"'Q Is it probably that it did in this instance?

A It is possible that she might have suffered it even though she hadn't had an injury although, of course, from averaging the injury will tend to weaken the system where a condition like that will develop more quickly than they would otherwise, you see?

Q Would it be your opinion that the injury probably caused the reaction to come on sooner?'

"* * *

"'A As I say, it's possible and lots of times it does happen, although, it would be impossible for me to just absolutely state, "Well, now, she would not have had this at all if it hadn't of been for this injury" it would be impossible for me to state that—it could be contributing and it could be that it would have happened anyhow.'

"* * *

"'Q What I want to know, Doctor, what you would say as to the probability in this instance—we are not talking about some other case— we are talking about this instance where you treated here for many months, whether it is likely or reasonably probable, in your opinion, that the injury would—that the injury did have something to do with these reactions?

A Well,—

Q Just tell me "yes or no" and I will move on to another question.

A Well, that is just like asking you to quit beating your wife, "yes" or "no" is—

Q Put it in your own words—

A —not—

Q Put it in your own words.

A That's not a good answer, see?

Q I am just simply asking—

A I—'

"* * *

"'Q You can—you used the word "possible" and I want to know if it was probable?

A It is quite often that injuries do tend to precipitate or in other words, they hurry up these things— this happens quite frequently, but there is no way in the world that I have or no way in the world that anyone could have to say whether they would have had these symptoms at this time—as you have stated here, it had been a number of months since she was injured and even if she had or had not been in-injured I couldn't tell you whether it hurried it up because they eventually do have these symptoms—a lot of them do, anyhow, you see, so it would be foolish to say that if she hadn't of been injured she never would have had these things— and she would have had them eventually—maybe not now—and maybe later—I just don't know; there is no way I can give you a definite answer.'

"* * *

"'Q Well, you notice that I am not asking you to say for sure—I am just asking you to say whether or not it is probable that the injury contributed to it?'

"* * *

"'A We know that they often do and it would be probable that it could

have helped—hurry it up or aggravated it,—that's quite true.'"

The record reflects that the appellant made numerous objections to the testimony quoted above, which were overruled.

Following Special Issue No. One[1], the court defined the term "injury" as follows:

"You are instructed that by the term 'INJURY' as used in this Charge, is meant damage or harm to the physical structure of the body, and such diseases or infection as naturally result therefrom, or the acceleration or aggravation of any disease or condition previously or subsequently existing, by reason of such damage or harm to the physical structure of the body."

Appellant objected to this instruction because it allowed the jury to consider the effects of syphilis on the disability of plaintiff. In connection with such objection, the appellant requested this additional instruction:

"You are further instructed the term 'INJURY' as used in this Charge does not include syphilis and its effect, if any, on the body of plaintiff."

Both appellant's objections to the definition of "injury" and requested instruction were overruled by the court.

All of the testimony of Dr. Pryor, as above quoted, was before the jury at the time of their deliberations and no instruction of the court was ever given to them not to consider same.

The appellant has brought forward 17 points of error. Appellant by its first two points of error complains:

(1) of the court's refusal to submit its requested instruction because there is no evidence of causal relationship between the alleged accident in question and activation of the dormant case of pre-existing syphilis of plaintiff;

(2) of the court's action in submitting to the jury, over its objection, the definition of injury, allowing the jury to consider the condition of syphilis in arriving at the incapacity or disability the plaintiff sustained when there is no evidence that the alleged injury was the producing cause of onset and effects of third degree syphilis.

It is appellant's contention that the testimony of Dr. Pryor constitutes no evidence of a causal connection between the back strain of plaintiff and the subsequent manifestation of third degree syphilis.

In the case of Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, (1949), a malpractice case, the court had before it the issue as to whether the testimony of two physicians that treatment of the arm of a four-year-old boy by defendant "possibly" caused his present complaints constituted any evidence. The trial court had directed a verdict for the defendant. The Supreme Court said:

"We do not find in the testimony we have recounted or elsewhere in the statement of facts any competent evidence that the negligence, if any, of respondent either in binding the boy's arm or in its subsequent treatment was a proximate cause of the contracture suffered by the patient. All it shows is that what respondent did was not a probable but only a possible cause of the contracture; that it was only one of several things that *could* have caused the injuries complained of. Therefore, this cause is ruled by the language of Circuit Judge Taft, in Ewing et al. v. Goode, supra, c. c., 78 F. 442, 'when the burden of proof is on the plaintiff to show that the injury was negligently caused by defendant, it is not enough to show the injury, together with

---

1. "Do you find from a preponderance of the evidence that Annie B. Semmons sustained an injury on or about the 18th day of July, 1963?

"Answer: 'WE DO' or 'WE DO NOT.'
"ANSWER:————"

the expert opinion that it might have occurred from negligence and many other causes. Such evidence has no tendency to show that negligence did cause the injury."

In Western Telephone Corporation of Texas v. McCann, 128 Tex. 582, 99 S.W.2d 895, (1937), suit was brought for the death of Mrs. McCann resulting from an electrical charge. Plaintiff's theory was that the defendant had improperly constructed its wires so that they became surcharged with atmospheric electricity and during the course of a thunderstorm, the plaintiff was killed while standing near one of the wires. In reversing the case, the Supreme Court said:

" * * * But the rule is elemental that the burden remains with plaintiff to the end of the case to establish by proof, not only the fact of the negligence averred, but also to show a direct connection between such negligence and the injury. Where the ultimate fact is not susceptible of direct proof, its existence must directly follow as a reasonable conclusion from its basic facts and circumstances, and it may be stated as an axiomatic rule that whenever court or jury are left by the evidence in a situation where, in order to find the ultimate fact alleged, *they must piece out the facts adduced with conjecture or supposition,* the plaintiff must be held to have failed in his proof. Where the evidence shows the injury might have been caused by the negligent act, but, in its aspect most favorable to plaintiff, is just as consistent with the inference that the injury might have been produced by another cause, *to send the case to the jury would be to accord them the right to make an arbitrary choice between equally probable but unproved conclusions, and thus the verdict, if for the plaintiff, would be based not entirely on evidence, but in part on mere speculation and conjecture.* (Emphasis added.) This would mean a reversal of the rule imposing the burden of proof on the plaintiff, since

the defendant, in order to prevent the jury from making him the victim of conjecture, would be forced to assume the burden of showing that his negligence did not produce the injury."

 We are well aware of the often cited rule that in workmen's compensation cases, the Workmen's Compensation Act will be liberally construed. Nevertheless, in a workmen's compensation case, the same as in a negligence case or a malpractice case, the burden of proof remains on the plaintiff to prove his case by a preponderance of the evidence.

We think this case comes squarely within the rule stated in Insurance Company of North America v. Myers, in an opinion delivered November 16, 1966, and reported in 411 S.W.2d 710, which was brought under the Workmen's Compensation Act. The facts as set out in the opinion in the Myers case reflect that Doctors Bonn, Littlejohn and Colquitt testified that a cervical strain injury such as that suffered by Mrs. Myers did not, in reasonable medical probability, excite or aggravate the malignant brain tumor causing her death. It is further shown by the testimony of a fourth doctor, Dr. Antonio Dieste, a surgeon also engaged in general practice in Marshall who was presented by the plaintiffs, that he attended Mrs. Myers from January 1, 1964, approximately six weeks after removal of the tumor, until her death. He testified in response to a hypothetical question that it was "reasonably probable that the injury she sustained *could have* aggravated the tumor, and become an exciting or concurring cause, so that it was one of the causes, to whatever degree, of the death of Jimmie Myers." It is also shown that Dr. Dieste gave other testimony concerning the aggravation of the tumor wherein he used the terms "could have," "possible," and "probabilities." In reversing the Myers case, the court stated:

"Other than with the possible exception of the reasoning of the court in Walker respecting cancer aggravation,

we have found no case in which lay testimony and the factual circumstances of an injury, together with expert testimony clearly limited to medical possibilities, have been held sufficient to support an inference that a pre-existing tumor was activated and the deadly effects of a malignancy accelerated by an injury. It is our view that such occurrence, or not, is a question of science determinable only from the testimony of expert medical professionals. * * * Casual (sic) connection in such a fact situation must rest in reasonable probabilities; otherwise, the inference that such actually did occur can be no more than speculation and conjecture. * * * Expert medical testimony predictive of what will happen in the future from a present injury is confined to reasonable medical probabilities, i. e., results reasonably to be anticipated. * * *

\* \* \* \* \* \*

"Here, the only medical testimony supportive of the jury finding that the injury suffered by Mrs. Myers was a producing cause of her death from cancer was the testimony of Dr. Dieste. A review of all he said in the context of the questions propounded establishes that Dr. Dieste did no more than express the medical possibility that the injury caused an aggravation or excitement of the pre-existing brain tumor in one of several possible ways and hence could have been a concurring or contributing cause of death. He himself summarized his testimony by saying that an aggravation 'could have resulted to this tumor.' Dr. Dieste did not state as his medical opinion that the injury did in fact, or in reasonable medical probability, aggravate or excite the pre-existing tumor; he stated only the medical possibility that such could have occurred. * * * In this state of the record causal connection is left to surmise or conjecture with the fact finder having to make an arbitrary choice between unproved conclusions. * * *"

See also Jacoby v. Texas Employers' Insurance Association, 318 S.W.2d 921, (Tex. Civ.App., San Antonio, 1958, writ ref., n. r. e.); Woods v. Safeway System, Inc., 223 A.2d 347, (Rhode Island Sup.Ct., 1966). An excellent article examining the Texas law on this point is found in Volume 29, Texas Bar Journal, page 805, entitled "Expert Testimony—Cause of Present Physical Condition."

In the case at bar it can likewise be said that Dr. Pryor never stated as his medical opinion that the injury did in fact or in reasonable medical probability aggravate or excite the pre-existing syphilis, nor do we find such medical testimony elsewhere in the record. He stated only the medical possibility that such could have occurred. As we view the testimony of Dr. Pryor in the instant case as to the causal connection between Annie Semmons' alleged injury and the aggravation or acceleration of the third degree syphilis, it is no stronger than that of Dr. Dieste in the Myers case.

Appellee argues that because there is medical testimony in the record that she was found also to be suffering from phlebitis, caused by the injury, which was sufficient to support the jury's answers to Special Issues Nos. 4 and 6, it is improbable that the verdict of the jury was based upon a finding that the initial damage or harm to her body aggravated or accelerated her syphilis.

Even though there was other evidence which could have caused the same finding, this would not eliminate the fatality of the error under the record in this case. McCarty v. Gappelberg, 273 S.W.2d 943, 949, (Tex.Civ.App., Fort Worth, 1954, writ ref., n. r. e.).

We cannot speculate as to what admitted testimony the jury did or did not consider in arriving at their answers to said issues. To say under this record that the jury, in arriving at its verdict, probably did not give any consideration to the testimony of Dr. Pryor to the effect that the third degree syphilis appellee was suffering from

*could have* or *possibly* was aggravated or accelerated by the alleged injury would be pure speculation.

■ In light of the rule announced in the Myers case, it is our view that causal connection in such a fact situation as here presented must rest in reasonable probabilities; otherwise, the inference that such actually did occur can be no more than speculation or conjecture.

■ The law is now settled that expert medical testimony predictive of what will happen in the future from a present injury is confined to reasonable medical probabilities, i. e., results reasonably to be anticipated. Insurance Company of North America v. Myers, supra.

■ In our opinion, the testimony of Dr. Pryor here under attack does not meet the test applied in the Myers case. Therefore, we hold that the testimony of Dr. Pryor, relating to the causal connection between the alleged injury and the third degree syphilis, constitutes no evidence of probative value.

It appears that Dr. Pryor's opinion as to total and permanent disability was based, at least in part, upon syphilis and its effect on appellee's body resulting from the alleged injury. This evidence was admitted over appellant's objection and also over appellant's objection the jury was allowed to consider the same in arriving at their answers to Special Issue No. 4 that plaintiff was totally disabled, and to Special Issue No. 6 that the plaintiff's total disability was permanent.

■ This brings us to a consideration of the question of whether the court's action in overruling appellant's objection to the court's definition of "injury" and refusing its requested instruction probably influenced a verdict unfavorable to appellant. This question is to be determined as a matter of our judgment in the light of the record as a whole. In order to discharge its burden of establishing whether such action was prejudicial, appellant was not required to prove or demonstrate that "but for" the erroneous action of the trial court in admitting the testimony, a different judgment would necessarily have resulted. It was only necessary that it establish that the evidence was reasonably calculated to and probably did cause the rendition of an improper judgment. Pittman v. Baladez, 158 Tex. 372, 312 S.W.2d 210, 216, (1958), and cases therein cited; Rule 434, Texas Rules of Civil Procedure.

■ In light of the record as a whole, we are of the opinion that such error amounted to such a denial of the rights of appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in this case. Rule 434, Texas Rules of Civil Procedure. Therefore, appellant's points of error 1 and 2 must be sustained and this case reversed and remanded. Moulton v. Alamo Ambulance Service, Inc., Tex., 414 S.W.2d 444.

All the points of error assigned by appellant are points which, if sustained, would require a remand of this cause. Consequently, our decision sustaining appellant's points of error Nos. 1 and 2 controls the ultimate disposition of this cause and renders unnecessary any consideration of appellant's remaining points of error.

The appellee's motion for rehearing is overruled, and the judgment of the trial court is reversed and remanded for further proceedings.