OTIS ELEVATOR COMPANY, Petitioner,

v.

Lou Mae WOOD et al., Respondents.

No. B–535.

Supreme Court of Texas.

Oct. 2, 1968.

Rehearing Denied Dec. 4, 1968.

Bailey, Williams, Weber & Allums, James A. Williams, Dallas, for petitioner.

Dunnam, Dunnam & Dunnam, W. V. Dunnam, Jr., Richey, Sheehy, Teeling & Cureton, J. Robert Sheehy, Waco, for respondents.

GREENHILL, Justice.

This is a personal injury action brought by W. P. Wood and his wife Lou Mae Wood for injuries sustained by Mrs. Wood in an escalator accident in the R. E. Cox department store in Waco. The defendants were (1) the Otis Elevator Company, which manufactured and allegedly designed the handrail and housing of the escalator; (2) the Cox Company; and (3) the Smith Building Company, which had been the general contractor for the Cox building. There was cross-actions between the defendants; but except for a question of indemnity later to be discussed, the problems here are between the plaintiffs and Otis.

As will be described, Mrs. Wood was caught and held in a narrow unguarded space next to the escalator's side wall by the moving handrail of the escalator. The responsibility for the design of the open space is a primary question as well as whether there should have been a protective extension to the side of the moving handrail.

Trial was to a jury which found that Otis designed the open space and that such design was negligence; that the failure of Otis "to have the top of the stationary guide upon which the rubber hand rail in question ran * * * extended out beyond the side surface of said rubber hand rail" was negligence; that Otis designed the escalator "with a hand rail with such a degree of friction as to pull human beings forward upon pressing a part of their clothing or body against the same," and that this was negligence. Each of the above acts of negligence was found to be a proximate cause of the injuries to Mrs. Wood. As will be noted below, the definition of proximate cause given to the jury included the element of reasonable foreseeability. The jury acquitted Cox and the Smith Building Company of negligence. Judgment was entered against Otis and for the plaintiffs on the jury verdict. The Court of Civil Appeals affirmed. 418 S. W.2d 532.

The questions before us are (1) whether there is evidence to support the jury finding that Otis designed the dangerous features of the escalator, and if so, whether Otis owed a duty to Mrs. Wood in view of the unusual way in which the accident occurred; (2) whether there is evidence to support the jury findings against Otis of negligence and proximate cause; (3) whether the trial court erred in admitting into evidence a hospital report and medical testimony that the accident could have caused Mrs. Wood to have a heart attack; (4) whether the cause should be reversed because of the jury argument; and (5) whether Otis is entitled to indemnity from Cox.

Mrs. Wood, an employee in the Cox department store, was injured when she came to the rescue of a small child who she considered to be in danger at the second-floor landing of a "down" escalator that led to the first floor. The second-floor landing was located at the end of a balcony overlooking the first floor. A protective railing extended along the edge of the balcony, but it had not been extended all the way to the edge of the escalator handrail. A space or opening of about seven inches was left between the wall of the escalator and the balcony railing. The opening led to the first floor, a drop of approximately thirty feet.

Mrs. Wood had been waiting on a customer when she heard a little girl scream. She looked up and saw that the child was "fixing to fall on her face down the escalator." She rushed over to the landing, approaching it from the side. When she reached the escalator, she leaned over the moving handrail and assisted the child. As she did so her body came into contact with the moving handrail, and it pulled her in the direction of the first floor and into the opening between the escalator and the balcony railing. She became suspended in the opening and remained there until she was pulled out by another employee. As a result of the accident she allegedly suffered some minor injuries and a heart attack.

*The "No Evidence" Question on
Responsibility for Design of
the Open Space*

■ Otis first contends that there is no evidence to support the jury finding that it designed the open space between the escalator handrail and the balcony railing on the second floor. The parties vigorously contested the responsibility for this opening. Otis' district supervisor testified that Otis did not design the open space. He stated that it was Otis' job to design "escalators, not buildings." In addition, a drawing that accompanied the proposed specifications submitted by Otis to the department store indicated that the enclosure of the escalator was to be completed "By Others." Moreover, the specifications provided that any drawings or descriptive matter furnished with the proposal were submitted only to show the general style and arrangement of the escalator. The evidence by Otis in this regard is strong.

There is, however, evidence to the contrary. The contractor and architect both testified that the plans submitted to the architect by Otis showed that an open space was to be left. The architect testified that he did not have any reason to believe that the open space was not necessary for the installation of the escalator. The interpretation of plans and this conflicting testimony created a fact issue regarding the design of the open space. The issue has been determined by a jury, and their finding is supported by some evidence.

*The Duty, or "No Duty," of Otis
as the Manufacturer of
a Chattel*

■ The parties have joined issue in their briefs on the duty, or lack of duty, of Otis as the manufacturer of a chattel, the escalator. Otis emphasizes that the escalator was designed to transport people on the moving stairs; that the stairs were working well; that there was no defect in the movement or in the mechanism; that Mrs. Wood was not using the chattel for

its intended use; and that as a manufacturer of the chattel it was not required to foresee the unusual "use" of the escalator by Mrs. Wood and hence owed her no duty. It therefore contends that as a matter of law it owes no duty to Mrs. Wood to exercise reasonable care in the design of its escalator, and particularly the open space adjacent to it, and therefore she cannot recover on a theory of negligence.

A manufacturer's duty of care with regard to the manufacture and design of his products is expressed in Sections 395 and 398 of the Restatement of Torts 2d (1965). Section 395 provides that:

"A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied."

Section 398, a special application of the rule in Section 395, is entitled "Chattel Made Under Dangerous Plan or Design." It provides that:

"A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design."

Otis stresses that its duty extends only to the intended use of the product, the movement of people. Liability ensues, it is argued, only if the injury occurs when the product is being used in a manner and for a purpose for which it was manufac-

tured. Since Mrs. Wood was not using the escalator for this purpose when the accident occurred, Otis concludes that it had no duty to design its product to protect her against harm.

A similar contention was made in Spruill v. Boyle-Midway, Inc., 308 F.2d 79 (4th Cir. 1962). In that case a child died from drinking furniture polish left within its reach by its mother. In a wrongful death action the parents sued on a theory of negligent failure to warn of the danger of consumption. The manufacturer raised the defense that it owed a duty only to guard against harm arising from an intended use of the product. Since the product was not intended to be consumed, the manufacturer argued that there could be no liability for death resulting from consumption. The Court refused to accept this argument:

> " 'Intended use' is but a convenient adaptation of the basic test of 'reasonable foreseeability' framed to more specifically fit the factual situations out of which arise questions of a manufacturer's liability for negligence. 'Intended use' is not an inflexible standard to be apodictically applied to every case. Normally a seller or manufacturer is entitled to anticipate that the product he deals in will be used only for the purpose for which it is manufactured and sold; thus he is expected to reasonably foresee only injuries arising in the course of such use.

> "However, he must also be expected to anticipate the environment which is normal for the use of his product and where, as here, that environment is the home, he must anticipate the reasonably foreseeable risks of the use of his product in such an environment. These are risks which are inherent in the proper use for which his product is manufactured." 308 F.2d at 83–84.

A contention similar to that urged in *Spruill* was also rejected in Haberly v. Reardon Company, 319 S.W.2d 859 (Mo. 1958). A twelve-year-old boy lost his vision in one eye while helping his father paint. The defendant paint manufacturer contended that it could not have reasonably foreseen that its product would be put to the "use" of splashing it into someone's eyes. The Missouri Supreme Court held that it was a jury question whether the manufacturer reasonably could have anticipated that, while being used as intended to paint bricks, some of the paint would be splashed into someone's eyes.

These cases illustrate the view that the "intended use" standard imposes upon the manufacturer the duty to guard against reasonably foreseeable risks of harm that are engendered by the intended use of his product. We agree with this view of the "intended use" standard, and accordingly disagree with Otis' argument that it owed no duty in this case. The escalator was being used by the department store for a purpose for which it was supplied; it was in operation and available to transport customers from floor to floor. Under the finding of fact in this case the "escalator" consisted not only of the moving stairs but also of their housing; i. e., Otis was responsible also for the design of the space adjacent to the moving stairs. There was testimony that Otis knew that persons of all sizes and ages would use the escalator and hence be in the area of the second floor landing. It was for the jury to decide whether Otis could reasonably foresee that someone might eventually come up against the handrail and be pulled in the direction of the opening between the handrail and the balcony railing. And in this case, the jury found in answer to the issues of proximate cause, as that term was defined, that the injury in question was foreseeable. We hold that Otis had a duty to that class of persons including Mrs. Wood to exercise reasonable care in the design of the escalator.

### Other "No Evidence" Questions

Otis has also brought forward points of error complaining that there is no evidence to support the jury findings

of negligence and proximate cause. In response to Special Issue No. 2, the jury found that Otis was negligent in failing "to have the top of the stationary guide upon which the rubber handrail in question ran, or a part thereof, extended out beyond the side surface of said rubber handrail in the area in question." This issue related to Mrs. Wood's theory that the escalator should have been designed with an extension to the side of the decking that supports the handrail to prevent persons from coming into contact with the moving rail.

There is evidence to support the jury finding. Mr. J. W. Bush, an engineer and partner in an architectural and engineering firm, tesified in substance that an extended decking was practical and would prevent persons from coming into contact with the moving rail. There is considerable testimony in the record from which the jury could conclude that one contacting the moving rail would be "jerked," "pulled," or "picked up." Mike Wilkinson, a part-time salesman at the department store testified to this effect, and also testified, without objection, that he had once seen a child picked up by the unprotected moving handrail on the end of the escalator. Mr. Miles Locke, an engineer called by Mrs. Wood as an expert witness, also testified that the side of the handrail exerted a pulling effect when touched by the body.

There is also evidence that such moving handrails are protected at other escalator installations, and that it would have been practical to do so at the department store involved. There is no explanation for the failure to protect the handrails by an extension of the stationary guide. Thus, the jury could have inferred from the evidence that the design of Otis' escalator was unreasonably dangerous, and that Otis was negligent in failing to provide an extension or protective rail to prevent persons from coming into contact with the moving handrail. We therefore hold that the foregoing evidence is legally sufficient to support the jury finding that Otis was negligent in failing to provide an extension or stationary

rail to prevent people from coming into contact with the moving handrail.

There is also evidence to support the jury's findings that the acts of negligence on the part of Otis were proximate causes of the accident. As stated, there is evidence that the unprotected moving handrail would exert a pulling effect upon one coming into contact with the rail from the side. Further, such contact would tend to pull the person coming into contact with the rail toward the open space left between the escalator and the balcony railing. Under these circumstances, a fact issue was created as to whether it was foreseeable that some nature of injury might occur from one coming into contact with the moving handrail from the side and being pulled toward the opening. Otis argues that it should not be required to foresee that a person might drape himself over the moving handrail in order to reach a screaming child. However, it is not necessary that Otis be charged with foreseeing the exact manner in which the injury occurred. It is sufficient that Otis "should reasonably have anticipated consequences or an injury of the general nature of that which ensued." Port Terminal Railroad Assoc. v. Ross, 155 Tex. 447, 289 S.W.2d 220, 224 (1956).

### The Hospital Report and Medical Testimony

Mrs. Wood pleaded that as a direct result of the accident she suffered a heart attack. Her counsel sought to establish this causal connection by offering into evidence a hospital consultation report written about Mrs. Wood by an attending physician one year and nine months after the escalator accident occurred. Counsel for Otis objected to the admission of the report on the basis that it did not record opinions and evaluations resting in reasonable medical certainty. The trial judge overruled the objection, and the report was admitted into evidence. The report related to surgery to remove a breast because of a tumor. It was not shown that the es-

calator accident caused the tumor, and that brought about a point on jury argument to be discussed later. The report read:

"Following the surgery, she seemed to be very weak and had a fairly marked tachycardia and because of this and because of the fact that on X-ray the heart showed slight enlargement, I ordered an electrocardiogram. To my considerable surprise, it came back showing very definite marked myocardial damage compatible with the residuals of an infarct. A repeated electrocardiogram a few days later was similar. Whether this was an old infarct with scarring and not related to her present symptoms or whether this actually represents a recent infarct of a silent type or of a relatively silent type with no pain and with no cardiac failure, but only some weakness is not yet certain. At any rate we may say the following things: She has done well from the standpoint of recovery from surgery. She is a mild diabetic, well controlled. She has hypertensive heart disease with the hypertension well controlled at the present time. Finally, she has definite evidence of residuals of a myocardial infarct on the electrocardiogram, but the age of this infarct is undetermined. She will still be treated conservatively and another EKG will be taken."

The problem of the admissibility under Article 3737e, Vernon's Tex.Rev.Civ.Stat. Ann. (Supp. 1967), of medical opinion entries was considered by this Court in Loper v. Andrews, 404 S.W.2d 300 (1966). Article 3737e, a statutory exception to the hearsay rule, was construed in *Loper* to permit the admission into evidence of a medical diagnosis appearing in a hospital record if "the diagnosis records a condition resting in reasonable medical certainty." 404 S.W. 2d 300 at 305. This requirement stems from the need to cross-examine the doctor making the entry when his opinion is an "expert conjecture," one not resting on demonstrable medical facts and about which there could be genuine dispute among doctors. The adversely affected party should in that instance be given an opportunity to challenge the basis of the expert's conclusions.

In *Loper* the subject of dispute between the parties was whether the condition diagnosed in the hospital report, a skull fracture, ever existed at all. In the case before us, however, the argument is not that there had been no heart attack at any time. Otis argues instead that the report is inadmissible because the doctor said that he was uncertain whether the heart damage was the result of a recent attack or whether it was due to an older attack and therefore unrelated to the condition for which Mrs. Wood was hospitalized at the time the report was written. We disagree.

Otis' argument is that the report itself reflects a lack of reasonable medical certainty because the doctor reveals that he does not know *when* the heart attack had occurred. Otis concludes that the admission of the report into evidence denied it cross-examination of the physician whose opinion was being placed before the jury for its consideration. However, the only damaging aspect of the report as far as Otis was concerned was the doctor's diagnosis that Mrs. Wood had suffered a heart attack. Apparently this diagnosis was not disputed, because Otis concedes in its brief in this Court the *existence* of a heart condition. Since it is not disputed that the diagnosis recorded a condition that rested in reasonable medical certainty, the policy behind Article 3737e of admitting reliable business entries without a mandatory right of cross-examination is satisfied. The added fact that the doctor stated that it was uncertain as to *when* the attack occurred did nothing, standing alone, to help Mrs. Wood establish the element of causation. An entry in a hospital report should not be excluded, and Article 3737e held inapplicable, on the grounds that the opportunity to cross-examine has been denied, unless there is a need to disprove what the entry tends to establish. In the case before us, the doctor's uncertainty as to when the attack occurred does not tend to establish any fact that would be damaging to Otis' position. We hold that

the report was admissible. Whether the accident at the escalator did, in reasonable medical probability, cause the heart attack is another problem which we now reach.

In connection with the above report, Dr. Fadal, who treated and examined Mrs. Wood, was asked to assume the facts of the accident, to assume that a year and nine months later the facts were as found in the hospital report, and to assume the facts set out in the cardiogram. He was then asked:

"In your opinion could the experience that this sixty-one year old lady with diabetes and hypertension and the pain and the bruising of her body and the exertion of running to that escalator at her age and her physical condition and being hurled through it in the manner I've described, in your opinion, *could* that have caused the scarring of her heart with the myocardial infarct. * * *[?]" [Emphasis added.]

Counsel for Otis objected to the question on the ground that it did not purport to bring the conclusion within the realm of reasonable medical probability, as opposed to a mere possibility. There followed a colloque at the bench, the substance of which was that the court reminded counsel for the plaintiff that the ultimate question would be based on reasonable medical probability. The Court told plaintiffs' counsel that he was not ruling that counsel could *not* ask the "could have" question, but the court suggested that counsel ask the question both ways; i.e., both "could have" and "did cause the heart attack in reasonable medical probability." The court then overruled the objection of defense counsel to the "could have" question, and Dr. Fadal's answer was:

"From this report, there was electrocardiographic evidence to surprise the doctor, because she had no symptoms at this time, that was compatible with the residuals of her previous myocardial infarction; which meant that the change in the electrocardiogram must have occurred sometime in the past. They were old changes, they were not acute or new changes. There are mycardial infarctions or heart attacks that are called "silent" that occur with damage to the heart that are not as full-blown as the classical type that people are used to seeing, and the situation you described, certainly *it could have been a possible cause of that.*" [Emphasis added.]

Plaintiffs' counsel thereafter asked some other questions and never got around to asking the "reasonable medical probability" question of Dr. Fadal.

Otis' points of error relating to this question and response complain that it was error for the trial court *to admit* Dr. Fadal's testimony. Our decision in Insurance Company of North America v. Myers, 411 S.W. 2d 710 (1966), is cited in support of this contention. *Myers,* however, involved the question whether there was some evidence, including a doctor's testimony, to support the jury's finding of causal connection between injury and death. We held that the doctor's testimony was "no evidence" of causal connection because the substance of his testimony was that it was not a reasonable medical probability that the injury caused the death; it was only a possibility. The basis of the holding was that "[c]ausal connection * * * must rest in reasonable probabilities; otherwise, the inference that such actually did occur can be no more than speculation and conjecture." 411 S.W.2d 710 at 713. We added, however, that reasonable probability is determined by a consideration of "the substance of the testimony of the expert witness and does not turn on semantics or on the use by the witness of any particular term or phrase." *Myers,* supra.

While under *Myers* the ultimate test or question is the substance of "reasonable medical probability," it was not error for the trial court to admit the preliminary question of *"could* the accident have caused the heart attack." The fact the counsel did not follow with the reasonable medical probability question will be dealt with below.

Refusing to allow Mrs. Wood's counsel to ask a "could have" question and excluding the testimony of Dr. Fadal on the same basis would also undercut the principle that it is the substance, not the form, of the testimony that is determinative. *Myers* makes it clear that evidence sufficient to support an inference of fact may consist of statements that an injury was "possibly" caused by a particular event, or "could have" or "might have" been the result of the event. Consequently, requiring that a question and response be phrased only in terms of "reasonable medical probability" prevents a plaintiff from demonstrating that the substance of an expert's view, however expressed, is that a causal connection is a reasonable medical probability. In short, the context of a witness' testimony may demonstrate that when he said "could have" he was using the phrase in the sense of "probably did."

There is serious doubt that the substance of the doctor's testimony met the test of reasonable medical probability. As stated, however, the point before us is the admissibility of the "could have" question. The question of causation of the heart attack is not otherwise before us. No special issue was given or requested as to whether the injury caused the attack. There was no objection to the charge or any special issue on that ground.

No request was made at the time the charge was given to the jury or otherwise that they be instructed that they should not take into consideration the heart attack because there was no evidence that in reasonable medical probability the injury caused the attack. If after hearing the testimony Otis did not regard causal connection as resting in reasonable medical probability, a proper manner in which to object was by requesting a special instruction to the jury to exclude the heart attack from their consideration on damages. See American Surety Co. v. Semmons, 413 S.W.2d 732 (Tex.Civ.App.1967, writ refused, n.r.e.). Otis did not request such an instruction. It did make a general objection

that there was no evidence to support the damages issue, but there was evidence that Mrs. Wood suffered other injuries than the alleged heart attack; and therefore it was not error to submit the damages issue. Otis did request, and there were given, instructions that in considering the damages, if any, suffered by Mrs. Wood, the jury was not to consider preexisting conditions except to the extent that they were aggravated, and that the jury was not to consider subsequent ailments independent of the accident. This latter instruction, of course, was probably intended to include the consideration of. the subsequent breast surgery. It is our opinion, as stated that these actions did not render the admission of the "could have" question erroneous or raise reversible error for the failure to have obtained an affirmative answer to the substance of a "reasonable medical probability" question.

*Jury Argument*

Otis has points calling for a remand of the cause because of the jury argument of plaintiffs' counsel. In most instances, the objections of defendant's counsel were sustained and would not require a remand, and it would require an undue lengthening of this opinion to set them out. The substance of one of the points, however, is as follows: During the argument, counsel referred several times to the fact that Mrs. Wood had been required to have her breast removed in order to combat the effect of cancer. He strongly intimated that the cancer was caused by the escalator accident. There was no evidence to this effect in the record. The first two times counsel referred to the breast surgery, no objection was made. The third reference to the surgery was objected to by opposing counsel and a jury instruction to disregard was requested. The following occurred:

"THE COURT: Well, I'll instruct Mr. Dunham to stay in the evidence and argue the evidence.

"MR. DUNHAM, JR.: We're trying to do exactly that, Your Honor.

"THE COURT: Well, you do it."

Counsel resumed his argument with another point.

■ Improper jury arguments are usually referred to as one of two types: "curable" or "incurable." A jury argument is "curable" when the harmful effect of the argument can be eliminated by a trial judge's instruction to the jury to disregard what they have just heard. The error is "cured" and rendered harmless by the instruction. On the other hand, an argument may be so inflammatory that its harmfulness could not be eliminated by an instruction to the jury to disregard it. The prejudicial nature of the argument is so acute that it is "incurable."

■ If the argument is of a "curable" nature, an objection to it must be promptly made and an instruction requested or the error is waived. But if the argument is "incurable," the failure to object does not result in a waiver. The reasoning is that "counsel making the argument is the offender so the law will not require opposing counsel to take a chance on prejudicing his cause with the jury by making the objection." Smerke v. Office Equipment Co., 138 Tex. 236, 158 S.W.2d 302 (Tex.Com. App. 1941).

■ We have concluded that the argument complained of was improper, but that its prejudicial effect was curable by an instruction to disregard. Otis failed to object in the first two instances in which the argument was made; and as to those instances, the error was waived. The third time the same argument was made Otis objected. It is at least doubtful that the instructions given were clearly understood by the jury. The trial court should have been less equivocal in instructing Mrs. Wood's counsel to confine his argument to injuries that had support in the record. The question arises whether the instruction, by possibly leaving the jury with the impression that the trial judge himself did not think counsel was arguing outside the record, was "calculated to cause and probably did cause the rendition of an improper judgment

* * *." See Rules 434 and 503, Texas Rules of Civil Procedure.

We have concluded that the inference that the trial judge regarded the argument as proper was not strong enough to constitute harmful error. The trial judge did not overrule Otis' objection, and his admonition to counsel to argue the evidence is susceptible to the interpretation that he thought counsel had not been doing so. We do not regard the court's ruling or instructions as reversible error.

### The Question of Indemnity

■ One final matter must be discussed. Mrs. Wood originally sued not only Otis, but also the department store owner, the Cox Company, and the building contractor, the Smith Building Company. Otis filed a cross-action against Cox for indemnity on the basis of a contract between Otis and Cox that required Cox to furnish proper framed openings for the escalator. Before trial, Mrs. Wood gave Cox and Smith a covenant not to sue, and they were nonsuited.

Otis argues that since Cox failed to provide proper framed openings for the escalator in accordance with their contract, Otis is entitled to indemnity from Cox; that Mrs. Wood cut off this right of indemnity by giving Cox a covenant not to sue, and that therefore Mrs. Wood should not recover judgment from Otis for any amount. As it relates to this matter, the jury found that Cox did not fail to provide proper framed openings for the escalator, and that the responsibility in this regard was that of Otis. We have upheld those findings.

Otis now contends that *as a matter of law* Cox failed to provide the proper framed openings in accordance with the contract. We disagree. The only evidence offered in support of Otis' contention is a provision in its contract with Cox that Cox was "To provide suitable floor openings, properly framed and finished *in accordance with our drawings,* and to provide in place all permanent enclosures, shutters, railings and

smoke baffles for the escalator well that may be required by law." [Emphasis added.] This provision created a fact issue regarding the suitability of the work furnished by Cox. The jury found that Cox had not failed to furnish proper framed openings, and we hold that the evidence presents an issue upon which reasonable men could differ.

The judgments of the trial court and the Court of Civil Appeals are affirmed.