**AMERICAN HOME ASSURANCE COMPANY, Appellant,**

**v.**

**Noe CORONADO, Appellee.**

**No. 9296.**

Court of Appeals of Texas, Amarillo.

Dec. 31, 1981.

Rehearing Denied Feb. 23, 1982 with opinion.

Chambers, Sturgeon & Boulter, Ben L. Sturgeon, Amarillo, for appellant.

Law Office of Schalan Atkinson, Schalan Atkinson, Hereford, Law Office of Robin Green, Amarillo, for appellee.

Before REYNOLDS, C. J., and DODSON and COUNTISS, JJ.

DODSON, Justice.

American Home Assurance Company appeals from a judgment based upon a jury verdict awarding Noe Coronado damages for total and permanent incapacity resulting from injuries sustained during the course and scope of his employment. The insurance company attacks the jury findings and judgment with legal and factual sufficiency points of error, and also contends that appellee's final jury argument was improper. We determine that the evidence supports the jury findings and that such findings are not so against the great weight and preponderance of the evidence as to be manifestly unjust. We also determine that appellee's final argument does not constitute grounds for disturbing the judgment of the trial court. Affirmed.

In the trial court, the parties stipulated that Coronado received an injury on or about 7 January 1978 while in the course of his employment with Armour Meat Packing Company, the insured employer. In response to the following special issues, with corresponding numbers, the jury found, among other things: (1) that Coronado's injury was a producing cause of total incapacity; (1a) that the total incapacity began on 10 January 1978; (1b) that the duration of the total incapacity is permanent; and (2) that the injury was not a producing cause of any partial incapacity.

American Home brings six points of error. In its first and fourth points, the company claims that the evidence is legally insufficient to support the jury's answers to special issues 1, 1a and 1b. These challenges require a review of the evidence.

Coronado testified at trial that he was forty-two years old, married, and the father of three minor children. He began working for the Armour Food Company in Hereford, Texas in 1972 in the cooler department. On 7 January 1978, while Coronado was performing his duties as a beef hooker in that department, a job which entails maneuvering sides of beef onto a hook, a side of beef fell to the floor and Coronado bent down to pick it up. While doing so, he felt a sharp pain in his lower back. He spoke to his supervisor and went home.

The next morning, Coronado was examined at the Family Clinic by one Dr. Canon, who gave Coronado some pain pills and instructed him to stay home for two or three days. Coronado took a few days off before returning to work. His condition worsened. He felt a sharp pain in his hip and could not take a full step with his left leg. He returned to the Family Clinic. Dr. Canon was out of town, so he was examined by Dr. Payne. Coronado was again told to rest for a few days. He did so and then returned to work. He saw Dr. Payne two

or three more times before the doctor recommended that he see a specialist, Dr. McKay.

After examining Coronado, Dr. McKay told him to return to work and to come back in thirty days if he felt the same. Coronado returned to work, and, just before thirty days had elapsed, his left leg went numb. Dr. McKay could not see Coronado immediately and sent him back to Dr. Payne, who gave Coronado more pain pills. When he got home, Coronado could not sit down, lie down, or walk. When he did get in to see Dr. McKay, the doctor told Coronado not to return to work and referred him to a nerve specialist, Dr. Charles Rimmer.

Dr. Rimmer thought Coronado had a ruptured disc and discussed the possibility of surgery, although no recommendation was made on that point. Dr. Rimmer told Coronado to stay home for a week and to do nothing but certain therapeutic exercises. For the next four or five weeks, the same advice was given: stay home and exercise. Finally, Dr. Rimmer told Coronado he could return to work, although Coronado testified that his condition had not improved.

Upon returning to work, Coronado informed his employers that he didn't think he would be able to do his job. He was told not to worry about it, that they had something for him to do. Thereupon, he was put to work as a scaler, a job which involves rolling cattle to the scale and recording their weights; no lifting is involved. Later he was given a permanent position as beef pusher, a job which entails pushing the beef to the scaler through the use of a battery-operated buggy. The beef pusher job is less strenuous than the job of beef hooker, but there were times when Coronado could not perform the beef pusher duties. At times, other employees would trade their lighter duties with Coronado.

Dr. John Albracht, a chiropractor, testified that he had treated Coronado since 17 May 1978. Dr. Albracht stated that Coronado complained of low back pain, pain and numbness in the left leg and left foot, and swelling in the left foot. The doctor performed a basic chiropractic physical examination which showed that Coronado had generalized muscular tension in all areas of the spine. The doctor stated that Coronado had a great amount of rigidity or stiffness in the spine and that he had restrictions on all of the four basic movements of the spine (i.e., flection, extension, lateral bending and rotation).

Upon x-ray examination, Dr. Albracht determined that there were several areas of spinal misalignment or displacement of the vertebrae. Specifically, he stated that "there were misalignments of the lumbar segments in the sacroiliac joint that involved the nerve roots that supplied the low back and the leg appendages"; "that he has first of all, an exaggerated lumbar curve, his spine is out of balance forward and there is a displacement and a stress effect on the 5th lumbar discs here, or a misalignment, or subluxation, we call it"; and that that condition is produced by extreme muscular tension and spasm in the lumbar muscles. The doctor testified that he conducted a number of other tests on Coronado and "found restriction of normal movement in every region of his spine, with the bulk of the test performed indicated there was great involvement, more so than average, in the lumbosacral region, that is the lumbar spine and the sacroiliac joint," and that the "lower back did not function as it is intended to."

Dr. Albracht stated that during the course of Coronado's treatment "the numbness in the leg and the swelling of the leg and the foot," and the recurring back pain never improved or changed. The left leg was one-half inch larger in diameter than the right leg. The bottom of the left foot was one-half inch larger than the right, and the left foot above the toes and around the arch of the ankle was one-half inch larger in diameter, which caused pain and numbness in that area of the foot. The doctor further stated that this swelling was the result of nerve impairment at the L–5 level of the lower back. In his opinion, the nerve impairment was caused by the formation of scar tissue in soft tissue (i.e., the disc) which

caused an encroachment, or an occlusion or a pinching or closing of the neuro ports in that area of the spine. He was further of the opinion that the condition represented the beginning stage of osteoarthritis, that he could not cure or arrest the condition, and that surgery would not help and would even harm the condition by replacing the present scar tissue with additional scar tissue, creating great nerve involvement.

Dr. Albracht also testified that Coronado had a fallen arch in his left foot attributable to the 7 January 1978 accident and that Coronado would need support to maintain a "reasonable normal balance in the future." Dr. Albracht added that this condition, too, was permanent.

Coronado's co-worker, George Perea, an assistant supervisor of the loading dock, testified that Coronado was a very hard and very intelligent worker. He said that when Coronado first returned to work, he did not hook beef, but was assigned the lighter scaling duties. After about one month, Coronado began pushing beef on Perea's crew. Coronado complained to Perea about not being able to handle the beef pushing work. Perea wanted to keep Coronado on his crew, so he at times traded jobs with Coronado, allowing Coronado to do the lighter scaling work. He further stated that although Coronado was a very good worker, his capacity to do work diminished after the injury. He particularly referred to Coronado's diminished endurance and continuous complaints about his leg. Perea stated, also, that Armour's employees had been notified that Armour planned to close the Hereford plant by 31 October 1980.

American Home called Thomas E. Wilson, Armour's employment and labor relations manager at the Hereford plant. Wilson stated that Coronado missed thirty-one days of work in 1978 due to the accident, no days in 1979, and two days in 1980 as of the date of trial; Coronado worked 639½ hours of overtime in 1978, 421 hours in 1979, and 234 hours in 1980 as of the date of trial, including 8 hours of overtime the Friday prior to trial. He further stated that Coronado's hourly wage had increased from $7.23 to $8.78 since the date of his injury. On cross-examination, Wilson testified that a physical examination is required of applicants at Armour, that the result of that examination is a big factor in whether or not an applicant is hired, and that he believed other companies had similar policies. He further stated that he would not hire someone as a beef pusher or hooker who had a ruptured lumbar disc.

American Home also called Mike DeGarmo and Richard Morales, two shipping supervisors at the Hereford plant. Both men knew Coronado and had observed his work after his injury. Both stated that they had seen Coronado carry an 80 lb. sack of salt on occasion since the injury, that they considered Coronado a good worker, that they would highly recommend him for future employment, and that they themselves would hire him anew based on his employment record.

In its charge to the jury, the trial court instructed that " 'TOTAL INCAPACITY' does not imply absolute inability to perform any kind of labor, but means that one is disabled from performing the usual tasks of a workman, not merely the usual tasks of any particular trade or occupation, to such an extent that he cannot get and keep employment." This definition was unchallenged.

■ In deciding the insurance company's legal insufficiency challenges to the jury's answers to special issues 1, 1a and 1b (i.e., the total and permanent findings), we must review the evidence and reasonable inferences therefrom in the light most favorable to the jury's findings and disregard all contrary evidence. See Garza v. Alviar, 395 S.W.2d 821, 823 (Tex.1965). The evidence shows that Armour planned to close the Hereford plant by 31 October 1980. Coronado could not do the beef hooking work which he had performed before his injury. Nor could he do the lighter beef pushing work and, as a result, was forced to exchange jobs with co-workers who did the even lighter scaling work. The chiropractor testified that Coronado had severe nerve involvement at the L-5 level in his lower

back, that the nerve involvement caused swelling and numbness in his left leg and foot, and that the condition was permanent. The evidence further establishes that most companies require a pre-employment physical examination, that that examination is a major factor in obtaining employment, and that, in general, companies do not employ individuals with lower back problems for hard manual labor. Accordingly, we conclude that the evidence is legally sufficient to support the jury's answers to the total and permanent issues. American Home's points of error one and four are overruled.

■ By points of error two and five, American Home maintains that the evidence is factually insufficient to support the jury's answers to special issues 1, 1a and 1b. In deciding these points, we must review and consider all of the evidence, both favorable and unfavorable to the company's position, to determine if the jury's findings of total and permanent disability are so against the great weight and preponderance of the evidence as to be manifestly wrong or unjust. *International Ins. Co. v. Torres*, 576 S.W.2d 862, 867 (Tex.Civ.App.— Amarillo 1978, writ ref'd n. r. e.).

In support of its position, American Home relies on *Com'l Ins. Co. of Newark, N. J. v. Puente*, 535 S.W.2d 948 (Tex.Civ. App.—Corpus Christi 1976, writ ref'd n. r. e.); *Texas Employers' Insurance Association v. Hawkins*, 387 S.W.2d 469 (Tex.Civ. App.—Amarillo 1965, writ ref'd n. r. e.), and other similar cases where the court concluded that the evidence was factually insufficient to support a jury's findings of total and permanent incapacity when the injured worker returned to lighter work and earned more money after his injury. Conversely, in support of his position, Coronado cites *Torres; Texas Employers' Ins. Ass'n v. Armstrong*, 572 S.W.2d 565, 566 (Tex.Civ. App.—Eastland 1978, no writ); *Texas General Indemnity Company v. Cox*, 544 S.W.2d 766, 768 (Tex.Civ.App.—Dallas 1976, no writ), and other similar cases where the court found the evidence factually sufficient to support a total and permanent disability verdict even though the injured

worker had returned to work and was earning more money. *Also see Texas State Highway Department v. Kinsler*, 230 S.W.2d 364, 367 (Tex.Civ.App.—Beaumont 1950, writ ref'd), in which the court stated, "We think it too well settled to require discussion that the fact that an injured employee continued to work and make money after his injury is not a bar to recovery for total and permanent disability if the evidence supports a finding of a court or jury that he is in fact so disabled."

The cases cited by the parties and other cases which support their respective positions demonstrate that in most worker's compensation cases the evidence is factually sufficient to support a wide range of jury verdicts, from total and permanent to temporary partial incapacity. The cases holding the evidence to be factually insufficient cannot easily be reconciled with the holdings to the contrary, and perhaps cannot be reconciled at all. However, there are some threads of consistency in the cases. It is consistently held that there is no precise formula by which incapacity may be measured. The duration and extent of disability received from an injury is at best an estimate which must be determined by a jury from all of the pertinent facts before it. *Torres*, 576 S.W.2d at 867; *Armstrong*, 572 S.W.2d at 566; *Gulf Insurance Company v. Hodges*, 513 S.W.2d 267, 272 (Tex.Civ.App. —Amarillo 1974, no writ); *Montoya v. American Employers Insurance Company*, 426 S.W.2d 661, 662–63 (Tex.Civ.App.—El Paso 1968, writ ref'd n. r. e.). Furthermore, the courts generally refrain from attempting to substitute their judgment for that of the jury on the issue of degree of incapacity. *Torres*, 576 S.W.2d at 870. Some courts even suggest that any doubt as to whether the evidence actually supports the jury finding of permanent incapacity must be resolved in favor of the right of the worker to receive compensation. *See Bailey v. American General Insurance Company*, 154 Tex. 430, 279 S.W.2d 315, 318 (1955); *Hargrove v. Trinity Universal Ins. Co.*, 152 Tex. 243, 256 S.W.2d 73 (1953); *Royal Indemnity Co. v. Smith*, 456 S.W.2d 218, 221 (Tex.Civ.App.—Ft. Worth 1970, no writ);

*Travelers Ins. Co. v. Arnold*, 378 S.W.2d 78, 83 (Tex.Civ.App.—Dallas 1964, no writ). Generally, these are the controlling principles in worker's compensation cases.

In this instance, having reviewed and considered all of the evidence, we conclude that the jury's answers to special issues 1, 1a and 1b (*i.e.*, the total and permanent findings) are not so against the great weight and preponderance of the evidence as to be manifestly wrong or unjust. Accordingly, we overrule American Home's second and fifth points of error.

■ In its third point of error, American Home claims that "[t]he District Court erred in rendering judgment on the jury's negative answer to Special Issue Number 2 denying the existence of any injury which would have been a producing cause of partial incapacity because the finding is supported by factually insufficient evidence; the evidence supporting such a finding is so weak and the evidence to the contrary so overwhelming that the finding is against the great weight and preponderance of the evidence and is clearly wrong and unjust." Our determination that the evidence is legally and factually sufficient to support the jury's findings on the total and permanent incapacity issues renders moot this point of error.

■ American Home's final point of error concerns Coronado's closing argument, in which he (1) attacked American Home and its counsel for failing to produce "their" doctors' medical testimony and (2) challenged the jury to conclude from their absence that had they appeared and testified, they would have confirmed Dr. Albracht's testimony or in some other manner provided evidence adverse to American Home. The first words of Coronado's final argument were, "Where are their doctors? Where are they? I didn't hear a one from the witness stand." Coronado's attorney subsequently stated that it is customary in cases of this type to introduce doctors' depositions. He asked rhetorically, "Where are those Depositions? The law provides in the State of Texas, that anybody that makes a workmen's compensation claim is forced ... to submit to examination by ... the doctor picked by the insurance company." He suggested further that if there were doctors with opinions which differed from Dr. Albracht's, "don't you know [American Home] would have them down here?"

Coronado's attorney made more statements to the same effect before being interrupted by American Home's objection following the statement, "Insurance companies, on workmen's compensation claims pay doctors much money. Doctors are inclined to want to cooperate with people that pay them a good deal of money." The objection was sustained by the trial court three times, but an instruction to disregard the improper argument was never requested by American Home.

Our Supreme Court stated in *Otis Elevator Company v. Wood*, 436 S.W.2d 324, 333 (Tex.1968), that improper jury arguments are usually referred to as either "curable" or "incurable." An argument is curable when its harmful effect on the jury can be eliminated by an instruction to the jury to disregard the improper portion of the argument. *Id.* If the harmful effect cannot be eliminated by such an instruction, the argument is "incurable." *Id.* In the case of a "curable" argument, an objection must be promptly made and an instruction requested or any error is waived. *Id.* If the argument is "incurable," no objection need be made to preserve error. In determining whether an objection and request for instruction were necessary in the present case, we must also consider whether the argument, considered in its proper setting, was reasonably calculated to cause such prejudice to the opposing litigant that a withdrawal by counsel or an instruction by the court, or both, could not eliminate the probability that it resulted in an improper verdict. *Texas Employers' Ins. Ass'n. v. Haywood*, 153 Tex. 242, 245, 266 S.W.2d 856, 858 (1954).

Under the circumstances of this case, we conclude that the argument complained of was curable. The argument was not so inflammatory as to probably result in an improper verdict in spite of a withdrawal or

instruction to disregard. If improper, its harmful effect on the jury could have been eliminated by an instruction to disregard. A timely objection and request for an instruction to disregard was therefore necessary to preserve any error. *Id.; Otis Elevator Company*, 436 S.W.2d at 333; *Hartford Acc. & Indem. Co. v. Thurmond*, 527 S.W.2d 180, 193 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n. r. e.). The record shows that the insurance company failed to object immediately the first time and every time thereafter that the offensive argument was made. *See Otis Elevator Company*, 436 S.W.2d at 333; *Hartford Acc. & Indem. Co.*, 527 S.W.2d at 193; *Zamora v. Romero*, 581 S.W.2d 742, 750 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n. r. e.). The record further shows that when the insurance company did object, it failed to request that the jury be instructed to disregard the improper portion of Coronado's argument. *Otis Elevator Company*, 436 S.W.2d at 333. Accordingly, we overrule the last point of error.

In summary, we overrule the insurance company's first, second, fourth, fifth and sixth points of error. Our determination of the first, second, fourth and fifth points renders moot the third point of error. The judgment of the trial court is affirmed.

## ON MOTION FOR REHEARING

On rehearing, American Home Assurance Company, the appellant, brings three assignments of error. In the first assignment, the appellant maintains that this court erred in holding that the evidence was legally and factually sufficient to support the jury's answers to special issues 1, 1a and 1b (*i.e.*, the total and permanent incapacity findings) because we improperly considered hearsay testimony to the effect that Coronado was suffering from a ruptured disc. This assignment of error makes reference to that portion of the opinion where we stated, "Dr. Rimmer thought Coronado had a ruptured disc and discussed the possibility of surgery, although no recommendation was made on that point." This statement and the other sentences in the same paragraph, paraphrase the following testimony of Coronado:

Q (By Ms. Atkinson) Mr. Coronado, *what did you find out about your back* after your initial visit with Dr. Rimmer?

A *I find out that what he thought it was, was a ruptured disc.* [Emphasis added.]

Q Okay. And, I believe you testified previously that you discussed surgery at that time?

A We did.

Q Okay, were you opposed to having surgery on your back?

A Well, we never did got down to it, but I was willing to have it.

Q Okay, did Dr. Rimmer give you a release to go back to work, or what instructions did Dr. Rimmer give you with regard to what you needed to do to take care of yourself?

A Well, the first time I went to see Dr. Charles Rimmer, he thought I—a possibility of a ruptured disc.

We talked, we sat down and talked about surgery. I said, "Well, I—" I didn't agree and I didn't disagree, we just, well, if that's what it takes, I guess that's what we have to be done.

But he says, "I'm going to give you—we got to give it a week and see how it will be." He said, he give me a week, and say, "Come back in a week."

Q Did he send you back to work?

A No, he said, "You stay home," he said, "don't do nothing, don't lift nothing, don't drive, just sit around the house, lay in bed and do some exercise." You know, I mean, what you call it, give a—

Q He gave you some exercises to do for therapy?

A Yeah.

Q Okay, did you follow those instructions?

A Yes, ma'am.

Q When did he tell you to come back?

A In a week.

Q Did you go back in a week?

A Yes, ma'am.

Q What happened when you went back?

A  He told me the same thing, "Come back in a week."

Q  Did he mention surgery?

A  No, we didn't never did mention surgery after that anymore.

Q  Okay, you went—did he still tell you to go back home and have bed rest, don't drive, don't lift, don't bend.

A  Every week that I went back, the same thing.  He told me that same thing for about five weeks straight along, until he finally told me that I could go to work.

Q  Okay, you went to Dr. Rimmer every week for five weeks, and then he finally released you to go back to work, is that correct?

A  Well, I don't know if he released me, or call that released or not, but he told me I could go back to work.

Q  Okay, had your condition improved?

A  Well, when I went back to work, I was feeling the same thing.  I mean, feeling the same way.

Q  Were you puzzled about why Dr. Rimmer had given you a release to go back to work when you weren't any better than when you went to see him?

A  Well, not really, because I didn't want to go back to him anyway.

Q  Why did you not want to go back to Dr. Rimmer?

A  I was—he wasn't doing nothing for me.

Q  What did you then decide to do?

A  Oh, me and my wife sit down in the house and discussed it that the best to go see another doctor.

Q  And, who did you decide to go see?

A  I decided to go see John Albracht in Amarillo.

None of the above testimony was objected to by the appellant.  Nevertheless, assuming, *arguendo*, that the testimony concerning what Mr. Coronado found out from Dr. Rimmer is hearsay, there is ample other probative evidence in the record, related by Dr. Albracht and other witnesses called by Coronado, which is legally and factually sufficient to support the jury's total and permanent incapacity finding.

In deciding American Home's legal and factual insufficiency challenges, we excluded Coronado's testimony concerning what he found out from Dr. Rimmer.  The evidence which we did consider in determining American Home's challenges is briefly summarized in the opinion as follows:

> The evidence shows that Armour planned to close the Hereford plant by 31 October 1980.  Coronado could not do the beef hooking work which he had performed before his injury.  Nor could he do the lighter beef pushing work and, as a result, was forced to exchange jobs with co-workers who did the even lighter scaling work.  The chiropractor [Dr. Albracht] testified that Coronado had severe nerve involvement at the L–5 level in his lower back, that the nerve involvement caused swelling and numbness in his left leg and foot, and that the condition was permanent.  The evidence further establishes that most companies require a pre-employment physical examination, that that examination is a major factor in obtaining employment, and that, in general, companies do not employ individuals with lower back problems for hard manual labor.

The first assignment of error is overruled.

In its second assignment of error, American Home asserts that this court erred "by finding that the testimony of appellee's co-worker George Perea was evidence of Coronado's inability to do the beef pushers [*sic*] job when in fact George Perea testified appellee could do the work of a beef pusher."  We made no such finding.  We summarized the testimony of all of the witnesses and concluded that a review of all of the testimony, including Coronado's, supported a finding that Coronado could not do the beef pushing work.  That there is evidence to the contrary does nothing more than raise a question of fact for the jury, and the jury has resolved the matter.  We will not substitute our judgment for the jury's by holding that the finder of fact is bound by one answer to one question by one witness which is taken out of context.  The second assignment of error is overruled.

In its third assignment of error, American Home maintains that this court erred in holding that the evidence was factually sufficient to support the jury's answers to the total and permanent incapacity issues "by failing to apply the proper legal test to the fact that there was no evidence that appellee's [Coronado's] return to work was as a result of economic necessity." In effect, American Home argues that an injured worker who returns to the same work after an injury is precluded from a total and permanent incapacity recovery unless there is evidence that the injured worker returned to work out of economic necessity. We disagree. *See Traders & General Ins. Co. v. Heath*, 197 S.W.2d 130, 133 (Tex.Civ. App.—Galveston 1946, writ ref'd n. r. e.); *see also* 39A Texas Digest, Workmen's Compensation, Key Numbers 840, 1636, for other cases to the same effect. The third assignment of error is overruled.

American Home's motion for rehearing is overruled.