**MONTGOMERY WARD & CO., Inc.,**
**Appellant,**

v.

**E. E. BREWER et ux., Appellees.**

No. 4621.

Court of Civil Appeals of Texas.

Waco.

May 25, 1967.

Rehearing Denied June 15, 1967.

**838**

Baker, Botts, Shepherd & Coates, William C. Bullard, J. E. Clements, Houston, for appellant.

Wiley Thomas, Angleton, for appellees.

OPINION

TIREY, Justice.

Mr. Brewer and wife brought this action against Montgomery Ward & Co., Inc., on an alleged cause of action sounding in tort for unreasonable collection efforts. Plaintiffs went to trial on their original petition and, pertinent to this discussion, they alleged:

"It has become necessary to file this suit by reason of the harassment which has resulted in emotional distress, illness and other bodily harm suffered by the Plaintiffs by reason of an alleged indebtedness of Plaintiffs to Defendant *in the approximate sum of Twenty-Seven Dollars ($27.00)*. In truth and in fact, Plaintiffs do not owe the Defendant anything and the Defendant has persisted in unreasonable collection efforts in reckless disregard of the health and welfare of your Plaintiff and his wife and such collection efforts by Defendant to try to collect the balance that is not owing constitutes a course of harassment that, * * * has resulted in emotional distress, illness and other bodily harm to the Plaintiffs. All of the acts of the Defendant were will-

ful, wanton and malicious; all of such acts were the proximate cause of the illnesses that Plaintiffs have suffered, including extreme nervousness, headaches, loss of sleep, reduction in ability to work, extreme fatigue and weariness of both Plaintiffs." (Emphasis added.)

They alleged that they had been damaged in the sum of $9,999.00.

The Court overruled Defendant's Motion for Instructed Verdict and submitted 4 issues to the jury. They are, substantially, (omitting the burden of proof clause):

1. Do you find that the telephone calls, letters, form letters, notices and statements made by or on behalf of Montgomery Ward & Co., Inc., to Edwin E. Brewer and wife, from on or about the month of December, 1964, constituted unreasonable collection efforts, as that term is defined for you herein?; to which the jury answered, "We do."

2. Do you find that such unreasonable collection efforts were a proximate cause of any physical illness or injury to Mr. Edwin E. Brewer?; to which the jury answered, "We do."

3. Do you find that such unreasonable collection efforts were a proximate cause of any physical illness or injury to Mrs. Edwin E. Brewer?; to which the jury answered, "We do."

Issue 4 submitted the damage issue; to which the jury answered "$6,000.00."

The Court, in his instructions to the jury, among other things said: "By the term 'unreasonable collection efforts' is meant a course of harassment on the part of a creditor which is willful, wanton and malicious and is intended to inflict mental anguish and resulting bodily harm." (There was no objection to this instruction.)

The record shows that Mr. Brewer is a graduate of Freeport High School, a

graduate of Texas A & M University, a former Captain in the United States Air Force in World War II, a graduate of the University of Texas Law School, a member of the Texas State Bar Association, a member of the Brazoria County Bar Association, a member of the American Bar Association, an attorney that represents the Angleton Bank of Commerce and the Angleton Savings and Loan Association, the City Judge of Danbury, Brazoria County, a member of the Board of Trustees of the Danbury Independent School District; that he and his wife have four children, one at the time of the trial, a student in the University of Texas, and three others at home. There is also a statement in the record to the effect that Mr. and Mrs. Brewer are quite well-to-do in their own right. Needless to say Montgomery Ward is one of the great corporations of our nation engaged in merchandizing, operating in many places in Texas. The record does not disclose how long Mr. and Mrs. Brewer had been customers of Montgomery Ward, but evidently they have been customers for some time, because on October 14, 1964, Mr. Brewer wrote Montgomery Ward the following letter:

"There seems to be a discrepancy in the charge account bill which I received from you this morning. According to my wife she sent in a $27.00 payment month before last and a $30.00 payment last month and according to your statement I do not see a credit for either one. Would you please send me a complete breakdown on purchases and payments *for the last six months*. Upon receiving this I will submit my check to you." (emphasis added.)

On December 30, 1964, Mr. Brewer wrote Montgomery Ward & Co.:

"Re: E. E. Brewer Account
P. O. Box 569
Angleton, Texas

"Gentlemen:

Yesterday, December 29th, I mailed my check to you in the amount of $108.28. After checking with my wife I find that she had also mailed payments on this account. Therefore I have stopped payment on my check, which is No. 1681, dated December 29, 1964 in the amount of $108.28 and drawn on the Angleton Bank of Commerce, Angleton, Texas. Please send me a statement showing the balance after the payments sent in by my wife, Dorothy N. Brewer have been credited to our account.

With kindest personal regards, I am,

Yours very truly,"

———◆———

There is nothing in Mr. Brewer's letters of October and December to indicate that he was out of patience but, on the contrary, indicated a knowledge and awareness of the fact that the Credit Department of Montgomery Ward & Co., was very inefficient and careless in the way they had treated the requests of a valued customer. There is nothing in the record to indicate that Montgomery Ward made any reply to Mr. Brewer's letters of October and December. The check was tendered in evidence; it is dated December 29, 1964, has on it Angleton Bank of Commerce, Angleton, Texas, payable to Montgomery Ward—$108.28. The check has Edwin E. Brewer, Attorney at Law, printed on it, and is signed Edwin E. Brewer, by Jean Mattisheard. On the left-hand side of the check is printed "Edwin E.

Brewer, Attorney-at-Law, Box 569, Angleton, Texas."

On January 19, 1965, Mr. Brewer wrote Montgomery Ward:

"Attention: Central Credit Unit
 Re: Edwin E. Brewer Account

"Gentlemen:

"Today I received a second request concerning my check in the amount of $108.28. If you will refer to my letter of December 30, 1964, I informed you that I was 'stopping payment' on this check, because of your foul-up in your bookkeeping section. My wife had been paying you in monthly installments on this account and I just became aware of it.

"Your 'second request', is the first and only request that I have received from you. If you will check your correspondence, as well as your bookkeeping records you will note that I stated then and I now restate that I have no intention of making good this check, so please return it to me.

"Please, as I requested in my letter to you of December 30th, copy of which is attached, send me a complete itemized statement of all purchases and payments made to date on this account."

———◆———

Montgomery Ward made no reply to the above communications. We find nothing in the foregoing letters to indicate that Mr. Brewer's patience had been exhausted, although, we can understand why it would have been, but at the same time the letters do not disclose such but, on the other hand, show that he was an intelligent person and knew that the bookkeeping department had carelessly made errors in the handling of his account, and he wanted it corrected. As we understand the record as shown by the Exhibits the next communication of Montgomery Ward with Mr. Brewer bears date "Jan", but the day of the month is not given, neither is the year, but under the record we assume it was 1965.

Plaintiffs' Exhibit 13, is addressed to Edwin E. Brewer, Box 569, Angleton

"Dear Mr. Brewer:

Amount $108.28
Date Jan

"Your check recently received and applied to your account has been returned from your bank. We have charged this amount back to your account and we ask that you mail your remittance to cover this check at your earliest convenience.

"If this matter cannot be handled within the next few days we ask that you contact us with your plans to replace the check. Your prompt reply will be appreciated.

Credit Department
M14–5191"

We cannot tell from the record whether Mr. Brewer's letter of January 19, 1965, addressed to Montgomery Ward was written after the notice from the Credit Department to him dated "Jan", above quoted.

Defendant's Exhibit 6, shows previous balance $20.00, payments $30.00, purchases $108.28, Feb. 2, 1965—new balance $58.28, accumulated payments now due $58.28. As we understand the record this notice was sent after February 2, 1965. In Defendant's Exhibit 7, (printed notice) shows previous balance $58.28, service charge 87¢, March 2, 1965, new balance $59.15, accumulated payments now due $59.15.

Plaintiffs' Exhibit No. 7 is dated August 10, 1965, it is:

> "Mr. Edwin E. Brewer
> P.O. Box 569
> Angleton, Texas

> "Dear Mr. Brewer:

> "I can understand your *beeing* out of patience with us about not being able to clear your account. I have found the $30.00 payment which you sent us and had not ever received credit. I have written Ft. Worth several times but they have not located the $27.00 you sent them on October 26. Did you make your payment by check and send direct to Ft. Worth? If so, did Montgomery Ward stamp the back of your check and if so what was the date? If you have a *receipe* what Number is on that? On September 23rd. of last year your account was transferred to us with the balance of $99.74 and we did not receive the $27.00 at this store. Please let me hear as I also want to clear the balance on your account. We have given orders for your statement not to have been sent to you. We are sorry that you have been receiving one.

> Thank you,
> (signed) M. Gajeske
> Montgomery Ward, Credit Department."

---

Plaintiffs' Exhibit 8, shows:

> "Regarding your account with
> MONTGOMERY WARD

> Balance due
> $34.19

> "Edwin E. Brewer
> Box 569
> Angleton, Texas

> Date Sept. 16, 1965

> "YOUR ACCOUNT
> has been placed with us for immediate collection.

> Good credit is YOUR MOST PRICELESS POSSESSION. Protect it by paying now.

> *Have payment in our office immediately*."

Plaintiffs' Exhibit 21 is:

## "MONTGOMERY WARD

"CREDIT VOUCHER Date 9–11–65

"Edwin E. Brewer
Box 569
Angleton, Texas

$34.19

"The above amount has been credited to your account for the following reason: tsf. to dht.

\* \* \*

(signed) DOLLIE
(Authorized by)"

Plaintiffs' Exhibit 18 shows:

"J. Novak Brewer Credit Limit LEDGER SET UP
Box 397 FOR SUSPENSE
Danbury, Texas Date 1-30-65
By J. H.

| "Balance | Purchases | payments | Credits | Time Price Differential | Amount now due | MO. | Amt. past due | COLLECTION MEMORANDUM |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Feb. | | |
| | | | | | | Mar. | | Sent to |
| | | | | | | Apr. | | Fort Worth |
| | | | | | | May | | and returned |
| | | | | | | June | | wrote customer |
| | | | | | | July | | |
| | | | | | | Aug. | | |
| | | | | | | Sep. | | 7/22/65 |
| | | | | | | Oct. | | trans to a/c |
| | | | | | | Nov. | | of Edwin |
| | | | | | | Dec. | | Brewer |
| | | | | | | Jan. | | MB |
| 30.00 CR | 00 | 30.00 | 00 | 00 | 30.00 | Feb. | 00 | |
| 30.00 CR | 00 | 00 | 00 | 00 | 30.00 | Mar. | 00 | |
| 30.00 CR | 00 | 00 | 00 | 00 | 30.00 | Apr. | 00 | |
| 30.00 CR | 00 | 00 | 00 | 00 | 30.00 | May | 00 | |
| 30.00 CR | 00 | 00 | 00 | 00 | 30.00 | June | 00 | |
| 30.00 CR | 00 | 00 | 00 | 00 | 30.00 | July | 00 | |
| 00 | 30.00 | 00 | 00 | 00 | 00 | Aug. | | |
| | | | | | | Sep. | | |
| | | | | | | Oct. | | |
| | | | | | | Nov. | | |
| | | | | | | Dec. | | |
| | | | | | | Jan. | | " |

As we understand Exhibit 18, it shows that the Brewers were not indebted to Montgomery Ward in any sum whatsoever, and in argument before our court, attorney for Montgomery Ward admitted that at the time the suit was filed that the Brewers were not indebted to Montgomery Ward in any sum. Mrs. Brewer testified in part:

"Q. Now, did you ever receive any more bills at the Danbury address after this one of October 2, 1964—the next, you will notice, is November, and it is to Angleton, and February, Angleton, and so on down the line, and you can go on through them and check and see.

"A. I am not sure I did, but I should be able to find them."

\* \* \* \* \* \*

"A. Yes. They sent hot letters in the mail practically every month telling me my account was delinquent, when it was not, because I was well ahead with my payments.

"Q. Was that after February, 1965?

"A. They sent hot letters numerous times while I was paying on the account, saying my account was delinquent, and accused my husband of writing a hot check, which is enough to upset anyone when you don't do that kind of thing."

\* \* \* \* \* \*

"A. Well, the hot letters that I received would be letters saying my account was delinquent, my account was past due.

"Q. Do you have any of those?

"A. No. I threw them in the wastebasket. I knew it wasn't past due."

\* \* \* \* \* \*

"Q. You say that those letters you got you threw away?

"A. Yes."

\* \* \* \* \* \*

"A. No, I don't remember when I received the first one; I know that I received some.

"Q. Do you know about how many you received at the Danbury address?

"A. No, I don't know, but I received about three or four or five.

"Q. Something like that?

"A. Yes. I didn't keep account of it. I know that every time I got one it upset me very much."

\* \* \* \* \* \*

"Q. Tell the Jury about the notices you received from Montgomery Ward, in addition to the statements you received?

"A. I received them in the mail, and while I was in the Postoffice I opened the envelope and saw it was a delinquent notice, and I just took it and threw it in the wastebasket, because I knew it wasn't true; and on one occasion I showed it to the Postmaster there because he knew how ridiculous it was.

"Q. Did you ever write Montgomery Ward on different occasions trying to straighten this out?

"A. Yes.

"Q. On how many occasions that you recall?

"A. Several.

"Q. What did you tell them in your letters?

"A. I just wrote a notation when I sent in my payments, and told them —they wanted to know who to credit this money to, so I wrote them a note, and I said, 'The account will either be under the name of Edwin E. Brewer, E. E. Brewer, or E. E. Red Brewer, or one of those names, and the check I sent in will be

signed Mrs. Dorothy Brewer or Dorothy J. Novak Brewer.'

"Q. Now, did you write those letters from home?

"A. Yes.

"Q. Now, has Montgomery Ward & Company ever produced for you or your husband, as far as this lawsuit, or your attorney, these letters you wrote them?

"A. No. They were notes; they really weren't letters."

\* \* \* \* \* \*

"Q. These so-called hot letters that you told us about, you didn't keep any of those?

"A. I just threw them in the wastebasket. I wish I had kept them, now."

Mr. Brewer testified in part:

\* \* \* \* \* \*

"A. No, Sir. I had written them on several occasions, and I didn't consider me calling them would accomplish anything else. If they didn't answer my letters, I didn't know I could talk to anyone up there that would give me any answers, either."

\* \* \* \* \* \*

"Q. Those little stickers cause you to have headaches?

"A. Continuously to receive them, yes, sir."

\* \* \* \* \* \*

"Q. But you just got two, did you not?

"A. We just could find two, that is all we have, and you don't have any?"

The judgment is assailed on 11 Points. Appellant's First Proposition is based on Points of Error 1, 2 and 3. It is:

"There was no evidence, or the evidence was insufficient, to prove that Montgomery Ward and Company, Inc., engaged in unreasonable collection efforts toward the plaintiffs inasmuch as the plaintiffs in the trial court wholly failed to prove that the defendant engaged in a course of harassment toward them which was 'willful, wanton and malicious and intended to inflict mental anguish and result in bodily harm.'"

We are in accord with this view, and such view will require this cause to be Reversed and Rendered.

It is the appellant's contention that the mistakes made within the Credit Department of Montgomery Ward in handling the account are different from the efforts to collect the account, and are not actionable and do not constitute a cause of action for unreasonable collection efforts. We are in accord with this view. The question here tendered is whether the communications of Montgomery Ward employees and the Houston Creditors' Association amounted to a course of harassment which was willful, wanton, malicious and intended to inflict mental anguish and bodily harm. We think the answer to this question is "No." The communications made by Montgomery Ward to the Brewers are what are to be tested as distinguished from the alleged errors made in the Credit Department in the handling of the account. There is nothing in the record to indicate that the employees in the Credit Department who handled the account of Mr. Brewer knew him; they had no malice or ill will toward him; certainly had no intention of doing him any harm, and their mistakes are free from being willful, wanton and malicious, and were not intended to inflict mental anguish or bodily harm upon him or his wife. Under the record all the acts of the employees in the handling of the Brewer account demonstrated that they were highly inefficient and negligent. In appraising the record here we must keep in mind the Court's instruction, to which there was no objection, where the Court said:

"By the term 'unreasonable collection efforts' is meant a course of harassment

on the part of a creditor which is willful, wanton and malicious and is intended to inflict mental anguish and resulting in bodily harm."

In Black's Law Dictionary, 4th Ed., we find the following definition:

"WANTON. Reckless, heedless, malicious, characterized by extreme recklessness, foolhardiness, recklessly disregardful of the rights or safeties of others or of consequences * * *."

In Walker v. Kellar, Tex.Civ.App., 226 S.W. 796–798, we find this statement:

"Malice means a wrongful act, done intentionally, or with evil intent, without cause or excuse, or as the result of ill will."

In Black's Law Dictionary, 4th Ed., we find this definition:

"MALICE. The intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances the law will imply an evil intent * * *."

In Cockrell v. State, 135 Tex.Cr.R. 218, 117 S.W.2d 1105, we find this statement relating to Malice:

"* * * [A] condition of the mind showing a heart regardless of social duty and fatally bent on mischief".

 We have given much consideration to this entire record, and measured by the yardstick that the Trial Judge instructed the jury to use in arriving at its verdict, we are of the view that the mistakes made in the Credit Department in handling the account was not done in a course of harassment upon the part of the creditor; that they were in no sense willful, wanton and malicious, and that they were in no wise intended to inflict mental anguish or bodily harm upon Mr. Brewer and his wife. These mistakes showed only the highly inefficient manner in which the employees operated in the handling of the Brewers' account. We are likewise of the view that the communications Montgomery Ward made to the Brewers concerning their account were made as a result of the highly inefficient methods in the Credit Department, and that such communications were in no sense willful, wanton nor malicious, and that they were not intended to inflict mental anguish and bodily harm on either Mr. Brewer or his wife. Under the Court's instruction it is our view that the plaintiffs have wholly failed to carry their burden and being of this view this cause is reversed and rendered.

In the event we are mistaken in this view we will consider Appellant's Second Proposition, which is:

"The jury argument delivered by counsel for plaintiffs in the trial court was grossly improper, inflammatory and unduly prejudicial to the defendant and its counsel, and was calculated to cause and probably did cause the jury to render an improper and incorrect verdict."

We are in complete accord with this view. The Second Proposition is based upon Points of error 4, 5, 6, 7, 8 and 9. At the outset perhaps we should say that there was no objection or exception taken to the argument of appellees' counsel, nor did appellant's counsel ask the court to instruct the jury to disregard the argument, and the objections were raised for the first time in its Motion for New Trial. The entire argument of plaintiffs' and defendant's attorneys was transcribed, and is shown in the transcript. Appellees' attorney, in his opening argument, early began his attack upon appellant's lawyer and his firm. We quote:

"This Plaintiffs' Exhibit 18 is manufactured evidence, If this were in existence at the time of the depositions in February, why wasn't it offered? * * * This was made at Montgomery Ward after Baker, Botts, Shepherd & Coates got into this lawsuit. Those are pretty

harsh words, aren't they? * * * I am now talking about Plaintiffs' Exhibits 21 and 22, this is manufactured evidence, this was made at Montgomery Ward and Company after Montgomery Ward Company was served with citation to answer this petition that I have filed on behalf of the Brewers. You can have Dolly Rodriguez come into this courtroom and speak in a voice that is hardly audible, but you are not going to explain to twelve men on a Brazoria County jury to their satisfaction that this could be made on September 11, 1965, and the billing procedures at Montgomery Ward kept it there until October 9. That is dishonorable, that is unethical, that is not being fair to the Brewers. * * *

"I wouldn't stoop to what Montgomery Ward has in this lawsuit if it would kill me. Those are harsh words * * *.

"* * * You know why those originals (letters from Mr. Brewer to Montgomery Ward—Plaintiffs' Exhibits 14, 15 and 16) are not down here? After Baker, Botts, Shepherd & Coates got into the suit, they destroyed the files, they 'lost' these letters, all but one. That is when Mr. Brewer wrote the $1,000.000 letter, trying to get their attention. No, Mr. Bullard and Mr. Jay and the widow lady that wants a lot of sympathy— she is not even a part of the suit—they destroyed the files. The stuff you see here is what the Brewers brought in on January 21 to my office. No. Montgomery Ward won't bring in the files, they destroyed the files after Baker, Botts got in the case."

At one point in the argument he directed his remarks to Mr. Bullard, trial attorney for Montgomery Ward, and said:

"Why did you tear up the record of Montgomery Ward, are you afraid for the jury to see it?

* * * * * *

"* * * They knew they were wrong they knew good and well they had this manufactured evidence made up, that when they manufactured their evidence before they filed this first pleading, they knew the Brewers didn't owe them a dime. * * *

* * * * * *

"I have got the screws on them as hard as I could, where they couldn't tell any more lies, they couldn't manufacture any more evidence, they couldn't destroy any more files. * * *"

Counsel in his closing argument said:

"* * * I am the man that stood before twelve men seated on the Jury and said that Montgomery Ward intentionally did away with the originals of these letters, all but his $1,000.000 letter * * *."

We have considered each part of the record very carefully and we find nothing in the evidence nor in Appellant's trial lawyer's argument that even tends to support or provoke the statements and severe accusations made by Appellees' counsel against Montgomery Ward and its counsel. At one point in Appellees' attorney's argument he said:

"It is unfair when an attorney representing Montgomery Ward will not let me have this check until the time of trial (there having been no discovery procedure for such check). * * *

"This is an honorable man. This is an honorable woman. They (the plaintiffs) both have got more money than either one of those lawyers over there (attorneys Bullard and Canton). * * *

"* * * Why did you tear up the record of Montgomery Ward, are you afraid for the jury to see it?

"* * * with all the money we had to spend to get the depositions, they come in with this amended original answer, 'Montgomery Ward admits that it made an honest mistake.' We say that is dishonest right there. * * *

"Here is some more dishonesty on the part of Baker, Botts, 'The Brewers have sought by this suit to punish Mrs. Gajeske.' There is one word that a judge told me one time I couldn't use in this courtroom, and I'm not going to take a chance with Judge Patterson, even though he is from Marlin. But I tell you now that is dishonest. * * * 'They are seeking to avenge a simple human error which anybody could make.' Uh-huh. That is not right, that is dishonest, that is not true. * * *"

Counsel for Appellees further said:

"Yes, your firm has been in Houston over a hundred years. There have been some splendid lawyers in your firm. Tom Phillips is going to be a big man in the State Bar, he is a splendid gentleman and a fine lawyer, and, sir, I doubt if he would be very proud of what has gone on down here."

Appellees' attorney charged that Montgomery Ward's counsel had persuaded witnesses to perjure themselves and withhold evidence and that this conduct was all a part of the conspiracy. He stated it in this manner:

"The only way to describe what I think is another point in this case is as a conspiracy. There was a conspiracy between Baker, Botts, Shepherd & Coates and everybody at Montgomery Ward that they would be hanged before I would find out who at Montgomery Ward turned this account over to the Houston Creditors' Association, and I can just hear Mr. Bullard now, when he is talking to Mrs. Gajeske, he says, 'Old Wiley is going to do this, but when you get on the stand, if you talk for five hours, say anything you want to say, but don't you ever say, don't tell him what happened to the tray off your desk,' and she hasn't to this living day."

Rule 269(e) of the Texas Rules of Civil Procedure provides:

"(e) Arguments on the facts should be addressed to jury, when one is impaneled and in a case that is being tried, under the supervision of the court. Counsel shall be required to confine the argument strictly to the evidence and to the arguments of opposing counsel. Mere personal criticism by counsel upon each other shall be avoided, and when indulged in shall be promptly corrected as a contempt of court."

It is obvious that this rule was adopted by the Supreme Court in order to erect walls of permissibility around the sort of free-wheeling jury argument which is useful only to inflame emotion and passion and to displace calm and reasonable analysis. Much has been written on what constitutes reversible error since the adoption of the new rules, and one of the best considered cases was written by Justice Calvert in Texas Employers Insurance Association v. Haywood, 153 Tex. 242, 266 S.W.2d 856 (1954). There we find this statement:

"What matters it that the argument is of a particular type or falls into a particular catagory? *The true test is the degree of prejudice flowing from the argument—whether the argument, considered in its proper setting, was reasonably calculated to cause such prejudice to the opposing litigant that withdrawal by counsel or an instruction by the court, or both, could not eliminate the probability that it resulted in an improper verdict.*" (Emphasis added.)

The question here is whether an instruction of the Court could have removed the prejudicial effects of the argument, or whether the effect of the argument was so inherently prejudicial and inflammatory as to prevent the rendition of a fair and just verdict whether or not the instruction was given. Our Courts have laid down the further rule that the comments of counsel deemed to be prejudicial need not be analyzed in isolation, because in such cases the cumulative effect of all

such statements must be considered. That rule was announced in Southern Pacific Company v. Hubbard, 156 Tex. 525, 297 S. W.2d 120–125 (1956). It would serve no useful purpose to discuss the many decisions that have been written by our Supreme Court on improper argument and we shall refer finally to the opinion of our Supreme Court in Howsley & Jacobs v. Kendall, 376 S.W.2d 562 (1964). In that case our Supreme Court in a unanimous opinion, said:

"We need not discuss the matter of improper argument at great length. We are fully cognizant of the fact that a trial before a jury in Texas is an adversary proceeding. Perhaps the lawyer who, in the heat of advocacy, has never made a remark that would call for a reversal of a judgment has not tried many closely contested cases. However, it is not the attitude, purpose, or motive of counsel that is of controlling importance. The important considerations are what was said and how in all probability such statements were understood by the jury."

At another point in that opinion, we find:

"It is our opinion that from the time the charge was made that someone else was testifying through the lips of Robert Myers, coupled with the statement as to a 'battery of lawyers,' the petitioners' case was irretrievably prejudiced. An assertion of facts having no evidentiary basis were placed before the jury and these asserted facts were in turn made the basis of an inflammatory appeal. No instruction of the trial judge could have removed the prejudicial effects of the argument and hence no objection was necessary to preserve the error." (See cases there cited.)

The foregoing rule announced by the Supreme Court is peculiarly applicable to the factual situation here as is illustrated by the quotations from the counsel's argument. There is no evidence that the dis-

tinguished counsel for Montgomery Ward & Company had manufactured any testimony in this record, or that they had done anything questionable in the handling of this litigation. Their whole conduct reflected preparation, careful consideration, not only of their client's interest, but their duty to the court and to counsel, and the litigants on the other side. There is no excuse for counsel having made such an unwarranted and unfair attack against opposing counsel and his firm. So, if we are mistaken in the view that the case should be Reversed and Rendered, then and in that event we think this cause should be Reversed and Remanded. Under the views here expressed, each of appellant's other points pass out of the case.

Reversed and rendered.