Opinion issued August 2, 2007 









 











In The

Court of Appeals

For The

First District of Texas






NO. 01-04-00566-CV

 __________


R.C. JONES, SUPERIOR WASTE MANAGEMENT SERVICES, INC.

AND JTI CONTRACTORS, INC., Appellants


V.


REPUBLIC WASTE SERVICES OF TEXAS, LTD. AND 

RUSTIN TRANSPORTATION COMPANY, L.P., Appellees






On Appeal from the 295th District Court

Harris County, Texas

Trial Court Cause No. 2001-59389






O P I N I O N

 This is an appeal from a final judgment rendered on a jury verdict in favor of
appellees, Republic Waste Services of Texas, Ltd. ("Republic") (1) and Rustin
Transportation Company, L.P. ("Rustin"), in a breach of contract and fraud action
brought by appellants, R.C. Jones, Superior Waste Management Services, Inc.
("Superior"), and JTI Contractors, Inc. ("JTI"). In two issues, appellants contend that
(1) as a matter of law, the evidence is insufficient to support the jury's verdict that
Rustin, Republic's subcontractor, did not breach its subcontracts with them by failing
to pay them certain rate increases for hauling trash and (2) the trial court erred in
denying their motion for new trial on the ground that Rustin's trial counsel engaged
in improper and incurable jury argument. We affirm.

 Background


 In 1999, the City of Houston began soliciting bids for a long-term contract for
disposal of its trash. The proposed 20-year project called for: (1) the construction
and operation of two City-owned transfer stations, one in southwest Houston (the
Westpark transfer station) and another in southeast Houston (the Lawndale transfer
station) and (2) the hauling of trash from these transfer stations to a landfill for
disposal. Republic was the low bidder on the City of Houston waste disposal
contract. The City estimated Republic's bid amount for the 20-year contract to be
$295 million. 

 All city contracts up for bid must comply with the City's Minority and Women
Business Enterprises ("MWBE") Program. Before being awarded a contract, a city
contractor must submit an MWBE participation plan, along with either executed
subcontracts or letters of intent for each MWBE subcontractor. For the proposed City
contract at issue, the City set the MWBE participation requirement as follows: "at
least 30% of the total value of all construction subcontracts or supply agreements"
and "contracts or supply agreements in at least 20% of the remaining value of this
Agreement." 

 Republic subcontracted all transfer station waste loading and hauling to Rustin,
which operates every transfer station in the City of Houston. Ted Meyer, Republic's
area president, and Donald Poarch, Rustin's owner, agreed that Rustin, which is not
an MWBE, would subcontract with MWBEs to meet the MWBE requirement. 
Superior, which is owned by R.C. Jones, an African-American, and JTI, which is
owned by Jesse Valeriano, an Hispanic, agreed with Rustin to haul waste to
Republic's landfill. Both Jones and Valeriano signed blank letters of intent. They
understood that the letters of intent were not themselves the agreements, but merely
precursors for more extensive and complete agreements. 

 Once City Council approved the contract with Republic (the "City Contract"),
Republic entered into a subcontract with Rustin. The Republic subcontract provided
for yearly rate adjustments pursuant to a formula set forth in the City Contract. 

 JTI and Superior each signed a set of three subcontracts (the "Rustin
subcontracts") to perform hauling work at the two City of Houston transfer stations,
Westpark and Lawndale. The Rustin subcontracts also provided for yearly rate
adjustments "for the applicable year" but did not define that term. 

 Westpark and Lawndale were scheduled to open in July 2000. However,
Westpark did not open until March 9, 2001, and Lawndale did not open until October
of that year. Until the Westpark and Lawndale transfer stations opened, JTI and
Superior agreed with Rustin to perform hauling work out of other privately-owned
transfer stations operated by Rustin including the Sommermeyer/290, Sam Houston,
and Friendswood transfer stations. 

 When the Westpark transfer station opened, Superior took both of its trailers
there, and JTI also began hauling from Westpark, although it hauled mostly from the
Sommermeyer transfer station. The Rustin subcontracts paid Superior and JTI an
initial rate of $5.25 per ton to work out of Westpark and Lawndale. However, at
Westpark, Superior's costs were $6.06 per ton and JTI's costs were $6.78 per ton. At
the contracted rate of $5.25 per ton, Superior and JTI were losing money working at
Westpark and Lawndale. 

 Jones recognized that Superior was losing money at Westpark, and he
requested a contract directly from Republic's president, Bill Linthicum. Linthicum
testified that Jones complained that "his drivers weren't being treated fairly to be
allowed to get the same number of loads that the . . . Rustin drivers were." Rustin
allowed Superior to send one of its trailers back to the more profitable Friendswood
transfer station. Both Linthicum and Jones exchanged proposed contracts that proved
unacceptable to the other. Jones took his concerns to the Mayor's Office of
Affirmative Action and Contract Compliance. Jones was told by the City that, once
the Lawndale transfer station opened, he needed to have both of his trucks running
from the Lawndale and Westpark transfer stations. 

 Faced with this dissatisfaction from Superior, Republic and Rustin reviewed
their records and discovered that JTI had been overpaid $1.81 per ton for the first four
months that Westpark was open, from March 2001 through June 2001. After the
overpayment was discovered, Poarch, Rustin's owner, asked Valeriano, JTI's owner,
to meet Republic's new area president, Linthicum, to discuss JTI's profitability. 
Valeriano told them that he was making money. On July 1, 2001, Rustin adjusted the
rate that JTI was paid to conform with the figures in the Rustin subcontracts.

 When the Lawndale transfer station opened in October 2001, Superior realized
that it could not make money hauling from there, either. By the end of the next
month, Superior ceased operations and sued Republic asserting a number of legal
theories, all based on a purported contractual and/or partnership relationship arising
out of the letters of intent. 

 While the litigation was ongoing between Superior and Republic, Republic and
Rustin asked Valeriano to prepare a profit and loss statement for the individual
transfer stations. Valeriano responded that he could not separate it by transfer station. 
Instead, he spent 10 minutes preparing a profit and loss statement and determined that
he was making money on the Rustin work. (2) 

 One month later, Superior's counsel deposed Valeriano in conjunction with the
Superior case against Republic and questioned him at length about the financial
statement that he had prepared. Based on the questions he answered during his
deposition, Valeriano "felt like [his] price increases hadn't been paid; and in going
through that financial statement that [he] had produced, [he] realized that maybe [he]
wasn't making money at Westpark like [he] had originally thought [he] was." 
Valeriano's CPA discovered that JTI was losing money at Westpark and had been
underpaid approximately $160,000 in Consumer Price Index ("CPI") rate increases. 
Valeriano also discovered that he was not getting a 10% participation in the MWBE
contract. After an investigation by Rustin in response to JTI's claims, Rustin issued
two checks totaling more than $65,000 to one of Valeriano's trucking entities. 
Because Valeriano cashed the checks and stopped hauling from the City transfer
stations, Rustin believed that the matter was settled. Valeriano notified Rustin that
he was terminating his performance under the Rustin subcontracts, but would
continue to haul from Sommermeyer. 

 JTI, who was represented by the same attorney who represented Superior,
subsequently intervened in Superior's suit against Republic, and Rustin was brought
in as a co-defendant. The parties appeared for trial. During closing argument,
Rustin's trial counsel alluded to how appellants' theory of the case was merely a
"lawyer's construct" and how Valeriano changed his testimony after meeting with
Superior's attorney. After a nearly three-week long trial, the jury rendered a verdict
for Republic and Rustin finding that there was no agreement for Superior or JTI to
have a 10% participation in the City Contract; that there was no fraud by Republic in
signing the letters of intent; and that Rustin had not breached its subcontracts.
Superior and JTI filed a motion for new trial and for judgment notwithstanding the
verdict that was denied by the trial court.

CPI Adjustments


 In their first issue, appellants contend that they are "entitled to judgment
against Rustin on the CPI claims because the unambiguous contracts should be
interpreted by the court, and the damages are liquidated and undisputed." (3) We
disagree.

Standard of Review

 A judgment notwithstanding the verdict ("JNOV") is proper when a directed
verdict would have been proper. Tex. R. Civ. P. 301; Fort Bend County Drainage
Dist. v. Sbrusch, 818 S.W.2d 392, 394 (Tex. 1991). A motion for JNOV should be
granted when (1) the evidence is conclusive and one party is entitled to recover as a
matter of law or (2) a legal principle precludes recovery. Mancorp, Inc. v. Culpepper,
802 S.W.2d 226, 227 (Tex. 1990); John Masek Corp. v. Davis, 848 S.W.2d 170, 173
(Tex. App.--Houston [1st Dist.] 1992, writ denied). We review the denial of the
appellants' motion under the legal sufficiency standard. See Brown v. Bank of
Galveston, 963 S.W.2d 511, 513 (Tex. 1998); CDB Software, Inc. v. Kroll, 992
S.W.2d 31, 35 (Tex. App.--Houston [1st Dist.] 1998, pet. denied).

 In a legal-sufficiency review, a court should look at all the evidence in the light
most favorable to the finding to determine whether a reasonable trier of fact could
have formed a firm belief or conviction that its finding was true. City of Keller v.
Wilson, 168 S.W.3d 802, 822 (Tex. 2005). To give appropriate deference to the
factfinder's conclusions and the role of a court conducting a legal sufficiency review,
looking at the evidence in the light most favorable to the finding means that a
reviewing court must assume that the factfinder resolved disputed facts in favor of its
finding if a reasonable factfinder could do so. Id. A corollary to this requirement is
that a court should disregard all evidence that a reasonable factfinder could have
disbelieved or found to have been incredible. Id. This does not mean that a court
must disregard all evidence that does not support the finding. Id.

Analysis 

 The jury answered the following questions pertaining to Rustin:

Question 9


 Did Rustin fail to comply with the contracts between Superior and
Rustin in payment of CPI increases?


 It is your duty to interpret the following language of the signed
agreements between Rustin and Superior:


 "The transportation rate for the applicable Contract Year shall be
adjusted . . . ."


 You must decide its meaning by determining the intent of the
parties at the time of the agreement. Consider all the facts and
circumstances surrounding the making of the agreement, the
interpretation placed on the agreement by the parties, and the conduct of
the parties.


 Answer "Yes" or "No":


 Answer: [No] 


Jury Question 19 simply replaced "Superior" with "JTI," but was otherwise verbatim. 
The jury answered Jury Question 19 "No" as well. 

 Superior and JTI each signed a set of three hauling subcontracts with Rustin. 
Exhibit "A" to each subcontract called for a rate adjustment for "the applicable
Contract Year," but did not define that term. Although appellants suggest that we
should construe the various contracts at issue as a matter of law, the trial court
evidently found language in these contracts ambiguous. In the jury charge, the trial
court submitted an instruction that the jury "must decide [the contract's] meaning by
determining the intent of the parties at the time of the agreement." See J.M.
Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003) (ambiguous contract
creates a fact issue on the parties' intent). Although appellants find it significant that
Rustin did not plead ambiguity, a court may conclude that a contract is ambiguous
even in the absence of a proper pleading by either party. Id. at 231.

 Section 6.03 of the City Contract provides for the adjustment of rates
"[b]eginning July 1, 2001 and each subsequent July 1, thereafter," in accordance with
the CPI formula set forth in Exhibit "H" to the contract. Appellants contend that the
Rustin subcontracts should be read together with the City Contracts to ascertain the
parties' intent. All six of the Rustin subcontracts were executed at the same time and
all say the same thing: Superior's and JTI's rates for the "applicable Contract Year"
shall be adjusted using the formula set forth in Exhibit "A." Appellants argue that the
language in Exhibit "A" of the Rustin subcontracts "exactly mirrors" the language in
Exhibit "H" of the City Contract. Appellants suggest that the Rustin subcontracts
should be read in conjunction with the City Contract, which, under its operative
provisions, includes a July 1, 2001 effective date for CPI adjustments. 

 Exhibit "A" to the Rustin subcontracts provides, in part, as follows:

 Cost Adjustment for Transportation Rate:

 The transportation rate for the applicable Contract Year shall be adjusted
by the cumulative percent determined as follows:


 0.30 times the Labor Index for the applicable Contract Year divided by
the Labor Index for March, 1998; plus 


 0.30 times the Machinery and Equipment Index for the applicable
Contract Year divided by the Machinery and Equipment Index for
March 1998; plus


 0.40 times the Fuel Index for the applicable Contract Year divided by
the Fuel Index for March 1998.


 Exhibit "H" to the City Contract provides, in part, as follows:


 CPI COST ADJUSTMENT


 The disposal rate for the applicable Contract Year shall be adjusted by
the cumulative percent determined as follows:


 0.20 times the Construction Index for the applicable Contract Year
divided by the Construction Index for March 1998;


 plus 0.30 times the Labor Index for the applicable Contract Year divided
by the Labor Index for March 1998; 


 plus 0.35 times the Machinery and Equipment Index for the applicable
Contract Year divided by the Machinery and Equipment Index for
March 1998;


 plus 0.15 times the Fuel Index for the applicable Contract Year divided
by the Fuel Index for March 1998.


(Emphasis added to note the differences in the two provisions.) Appellants find it
significant that both exhibits capitalize "Contract Year." They argue that, if the
subcontracts and the City Contract are read together and the rate is adjusted on July
1 of each year, Superior is due $77,204 and, after crediting Rustin for its overpayment
on the Sommermeyer/Highway 290 route, JTI is due $160,002. (4) 

 In contrast, both Rustin's president, Sid Sherwood, and owner, Donald Poarch,
testified that its intent was for Superior and JTI to get increases when Rustin received

its increases under Rustin's various contracts. (5) The appellants argue that, if there is
an ambiguity, "a possible interpretation of 'applicable Contract Year' is that Superior
and JTI were to receive rate adjustments on each route when Rustin received its
adjustments from its customers." Using these dates for adjustments, the appellants
assert that Superior is due $72,618 and JTI is due $154,987.96. 

 Finally, appellants state that "the only other interpretation for the 'applicable
Contract Year' is that the rate increases were to be paid one year after actual work
began on each route." Appellants contend, however, that this interpretation is
unreasonable when viewed in light of the context of the other contemporaneous
contracts and circumstances. In summary, appellants argue that, under any
interpretation, Rustin breached its contracts and failed to pay the adjustments. 

 Rustin asserts that neither Superior nor JTI was entitled to any adjustments
because (1) Superior stopped hauling before any CPI increases became due and (2)
JTI "was brought up to date on all its CPI increases in February 2003, after it quit
hauling from all but the Sommermeyer transfer station, for which it had been
previously overpaid." In June 2001, Poarch's CPA, Jim Pouns, proposed to
Republic's president, Bill Linthicum, that Rustin receive a rate increase. Pouns asked
for a delay on any increases, and Pouns asked Linthicum what constituted the
"applicable Contract Year" for purposes of CPI adjustments under Superior's
contracts with Rustin. Linthicum responded via e-mail that he thought the
"applicable Contract Year" meant the "initial operating date," which, for the City-owned transfer stations, was March 9, 2001, when the Westpark transfer station was
opened. Linthicum's e-mail stated that "I have read the contract between Rustin and
Superior, and I interpret the contract year as March 9, 2001, though March 8, 2002. 
There is nothing in the contract defining 'contract year.' Superior Waste
Management stated this contract began on March 9th, 2001, not when the agreement
was signed." Accordingly, Linthicum instructed Rustin to prepare for a CPI
adjustment for Superior in March 2002, and, as is standard in the trucking industry,
only if Superior requested one. (6) Neither Superior nor JTI requested a CPI increase
either in July 2001 or March 2002. 

 Jones's first formal request for a rate increase was in a demand letter sent by
his attorney in August 2002 after Superior had already stopped hauling for Rustin. 
Sid Sherwood, Rustin's president, responded and explained that Superior was not due
any adjustments using the base year 2000 because decreases in the fuel index--the
most heavily-weighted index under the Rustin subcontracts--offset any increases in
other indices. However, Superior's inquiry prompted Sherwood to ask Jim Goodyear
to review JTI's numbers to determine if JTI was being paid the proper rate. Using
March 1, 2002 as the initial due date for CPI adjustments and the CPI formula in the
Rustin subcontracts, Goodyear found that JTI was underpaid on some routes and
overpaid on others (namely, Sommermeyer), and he prepared a schedule of price
increases for JTI, effective on September 1, 2002. 

 Goodyear testified that he used the date of March 1, 2002 to calculate the CPI
adjustments because that date was the one-year anniversary of the opening of
Westpark; in other words, it was the first due date for an adjustment based on a March
1, 2001 "Initial Operating Date." (7) Consequently, Rustin issued two checks to JTI
totaling more than $65,000. With respect to Superior, Goodyear indicated that it was
not entitled to adjustments because it was no longer hauling for Rustin as of March
1, 2002. 

 Appellants have presented at least three different versions of how the contract
could have been interpreted. Rustin presented evidence from, among others, Jim
Goodyear and Bill Linthicum who both testified that it was their understanding and
impression that the adjustment date should be March 2002, if requested by JTI and
Superior. We must assume that the jury resolved disputed facts in favor of its finding. 
See City of Keller, 168 S.W.3d at 822. After reviewing the record in the light most
favorable to the jury's finding and disregarding all evidence that a reasonable
factfinder could have disbelieved or found to be incredible, we hold that the evidence
is legally sufficient to support the judgment and the trial court did not err in denying
the appellants' motion for directed verdict.

 We overrule appellants' first issue.

Incurable Jury Argument


 In their second issue, appellants argue that the trial court erred in denying their
motion for new trial because "the false accusations against counsel for Superior and
JTI that he had suborned perjury" made by counsel for appellees in closing argument,
"constitute incurable, reversible error." Appellants argue that "House committed
incurable reversible error by accusing John Able (Rustin's trial counsel) of suborning
perjury." "Attacks upon the integrity of opposing counsel are categorically
prohibited." Appellants further argue that "Ms. House planned this argument. She
attempted to plant the seed of some improper conduct by Mr. Able during her cross. 
She then argued it as fact during her closing argument." Appellants contend that,
because the evidence "absolutely establishes that Rustin failed to pay the contracted
rate for services to Superior or JTI," it is impossible to conclude that the jury was not
influenced by the "outrageous accusation" against Superior and JTI's lawyer. We
disagree.

Closing Argument and Motion for New Trial

 In closing argument, Republic's counsel commented that "[t]his case is a
construction of attorneys, trying to turn a letter of intent into something entirely
unintended by any of the parties." Next, Rustin's counsel, Jennifer House, stated

 [House]: [Republic's lawyer] alluded to the fact that this case
is a lawyer's construct, it is created by lawyers. I am
proud to be a lawyer. I take no pride in accusing
other lawyers of wrongdoing, but I cannot help but
have difficulty with the fact that Rustin never made
representations to these minority subcontractors that
they were going to be entitled to overall 20 percent
participation of $295 million.


 . . . 


 And when [Valeriano] testified in October of 2002
that he was operating profitably from Westpark and
Lawndale, he was telling the truth. 


 Why did the story change, then? Why did the story
change? Because he met Mr. Able and Mr. Able
said, "Jesse, by the way, did you know under our
theory you are entitled to $5 million of profit over
20 years?"


 [Able]: Objection, Your Honor. There is no evidence that I
told him anything.


 [Trial Court]: Sustained.


 [House]: Suddenly -- and you heard the testimony. Mr. Able
questioned him, and the testimony was he met with
Mr. Able after his deposition. Do you know who
else he met with? The gentleman sitting in this
corner right here, Greg Brown, CPA.


 . . .


 And I will tell you why he is a party to this lawsuit. 
Because the couple of hundred thousand dollars that
he was going to make or was making with Rustin,
vis-a-vis the existing work that he was doing, in his
mind was peanuts compared to the $5 million that he
was going to ask you for under the trumped up claim
that he was entitled to 10 percent of $295 million
over 20 years. And that's why the story changed,
and that's why we are here.

 After nearly three weeks of trial, the case was submitted to the jury on issues
primarily relating to whether the Letters of Intent gave rise to a contract between
Republic and Superior and/or JTI, whether Republic breached that contract, whether
Republic committed fraud in connection with the Letters of Intent, and whether
Rustin breached its subcontracts with Superior and JTI to pay CPI increases. By an
11-1 verdict, the jury found in favor of Republic and Rustin on all issues.

 Appellants filed their motion for new trial, alleging, among other things, that
House's closing argument constituted incurable, reversible error. After significant
briefing and two hearings, the trial court denied the motion. In its order, the trial
court stated that 

 the court considered the entire record and believes that the evidence
supports the jury verdict and was not the result of the improper,
inflammatory jury argument made by Jennifer House.


 The court has reviewed all of the evidence in the case supporting
the jury verdict and finds that there is more than sufficient evidence to
support the verdict. The court also notes that the inflammatory
argument was of short duration, was not repeated, and an objection to
the argument was promptly sustained. There was also evidence that Mr.
Valeriano's testimony did change. The court finds that the probability
that the jury verdict was grounded on proper evidence is greater than the
probability that the verdict was based on the improper argument. 


 But let there be no doubt that the argument was improper. And
although Ms. House in oral argument stated that she "was stunned by the
seriousness with which the Court regarded the allegations," the denial
of the new trial does not mean that the court condones this type of
argument. Attacks on opposing counsel are error. (citations omitted)


 In Ms. House's argument she completely concocted a
conversation between the plaintiff's counsel, Mr. Able, and the plaintiff,
Mr. Valeriano, and implied that Mr. Able suborned perjury. Ms. House
stated in closing argument "Why did the story change, then? Why did
the story change? Because he met Mr. Able and Mr. Able said, 'Jesse,
by the way, did you know under our theory you are entitled to $5 million
of profit over 20 years?'" 

 

 What is most disturbing is Ms. House's attempt to explain away
this made-up conversation. In her brief and in her oral argument before
the court she attempted to justify her statement, claiming it was based on
questions asked by Mr. Able in a deposition. The court has reviewed the
entire deposition of Mr. Valeriano and there is no reference to such a
question or statement or meeting. And most certainly there was no
evidence before the jury of such a question or statement or meeting. Ms.
House continues her misstatements in her briefing. At page 5 of her
brief, Ms. House says, "each and every questioned statement made by
Ms. House is in the record and is based in fact." There is absolutely no
evidence in the record of such a meeting or such a statement.


 At oral argument, realizing that the court was skeptical that
questions were asked in a deposition would be considered a meeting,
Ms. House then argues that Mr. Able and Mr. Valeriano must have met
to form the attorney client relationship and that such a meeting could be
inferred from the fact that Mr. Valeriano became Mr. Able's client. 
While undoubtedly there were many meetings between Mr. Able and
Mr. Valeriano, (although of course there is no evidence in the record of
such meetings) what Ms. House fabricated was the content of such a
meeting and the implication that Mr. Able suborned perjury and induced
Mr. Valeriano to change his story. 


 Lawyers, in the heat of battle, do make misstatements of fact and
law, and unwarranted personal criticisms. But they should not
compound their errors in legal briefs filed after careful reflection. And
they should not impugn the rest of their law firm by making an irrelevant
argument that "all of my partners were 100% behind my representation."


Standard of Review

 We review the denial of a motion for new trial to determine if the trial court
abused its discretion. Champion Int'l Corp. v. Twelfth Court of Appeals, 762 S.W.2d
898, 899 (Tex. 1988) (orig. proceeding). A trial court abuses its discretion when it
acts in an arbitrary or unreasonable manner or if it acts without reference to any
guiding rules or principles. Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238,
241-42 (Tex. 1985). 

 To obtain reversal of a judgment on the basis of improper jury argument, a
complainant must prove (1) an error; (2) that was not invited or provoked; (3) that
was preserved at trial by a proper objection, motion to instruct, or motion for mistrial;
(4) that was not curable by an instruction, a prompt withdrawal of the statement, or
a reprimand by the trial court; and that (5) the argument by its nature, extent, and
degree constituted reversibly harmful error. Standard Fire Ins. Co. v. Reese, 584
S.W.2d 835, 839 (Tex. 1979). Reversal is proper only upon a showing that "the
probability that the improper argument caused harm is greater than the probability
that the verdict was grounded on the proper proceedings and evidence." Id. at 840.

An Error

 To obtain reversal, appellants must first prove "an error" that was not "invited
or provoked." Id. at 839. Counsel must confine argument "strictly to the evidence
and to the arguments of opposing counsel." Tex. R. Civ. P. 269(e). Criticism,
censure, or abuse of counsel is not permitted. Appeals to passion and prejudice are
improper, as are calls to punish a litigant for the acts of counsel. Tex. R. Civ. P. 269;
Tex. Disciplinary R. Prof'l Conduct 3.04 (1990), reprinted in Tex. Gov't Code
Ann. tit. 2, subtit G. app. A (Vernon 2005) (Tex. State Bar R. art. X, § 9). 

 In this case, there was no evidence of any post-deposition meeting between
Valeriano and his attorney. House's assertion that Valeriano's testimony changed
"because he met Mr. Able and Mr. Able said, 'Jesse, by the way, did you know under
our theory you are entitled to $5 million of profit over 20 years?'" and her decision
to repeat Republic's statement that this "case is a lawyer's construct" constituted
improper jury arguments. See id. House's closing arguments were not confined "to
the evidence and to the argument of opposing counsel," and thus violated rule 269(e). 
No one argues that the error was invited or provoked.

Preservation of Error

 Appellants must next prove either that the uninvited error (1) was preserved at
trial by a proper objection, motion to instruct, or motion for mistrial or (2) was not
curable by an instruction, a prompt withdrawal of the statement or a reprimand by the
trial court. Standard Fire Ins. Co., 584 S.W.2d at 839. If a party is to preserve error,
an objection must be made when the improper argument occurs, unless the conduct
or comment cannot be rendered harmless by proper instruction. Dow Chem. Co. v.
Francis, 46 S.W.3d 237, 241 (Tex. 2001). The burden to prove that improper
argument was incurable rests on the claimant. See Gen. Motors Corp. v. Grizzle, 642
S.W.2d 837, 845 (Tex. App.--Waco 1982, writ dism'd).

 Appellants made one objection to the argument, and the trial court sustained
the objection; however, appellants failed to request that the trial court instruct the jury
to disregard the argument. Appellants did not request any relief from the trial court
regarding these comments until their motion for new trial, after the jury had returned
a verdict. Thus, to prevail, appellants must show that the statements constituted
incurable jury argument. See Busse v. Pac. Cattle Feeding Fund No. 1, Ltd., 896
S.W.2d 807, 815 (Tex. App.--Texarkana 1995, writ denied) (stating failure to press
for instruction at time of erroneous jury argument operates as waiver of any possible
complaint about argument). 

 Improper jury arguments can be either curable or incurable. Otis Elevator Co.
v. Wood, 436 S.W.2d 324, 333 (Tex. 1968). A jury argument is "curable" when its
harmful effect can be eliminated by instructing the jury to disregard what they have
just heard. Id. However, when an argument is so inflammatory that its harmfulness
could not be eliminated by an instruction to the jury to disregard it, the prejudicial
nature of the argument is so acute that it is "incurable." Id. If an argument is
considered to be curable, counsel must make a prompt objection to it and request an
instruction, or the error is waived. Id. When an argument is incurable, a failure to
object does not result in a waiver, under the reasoning that "counsel making the
argument is the offender so the law will not require opposing counsel to take a chance
on prejudicing his cause with the jury by making the objection." Id. Whether an
argument is incurable depends on "the degree of prejudice flowing from the
argument--whether the argument, considered in its proper setting, was reasonably
calculated to cause such prejudice to the opposing litigant that a withdrawal by
counsel or an instruction by the court, or both, could not eliminate the probability that
it resulted in an improper verdict." Id.

 Here, to decide whether the jury argument was incurable, we examine the
record to determine whether an instruction to disregard House's improper arguments
would have sufficiently remedied the harm. See Standard Fire Ins. Co., 584 S.W.2d
at 839; Goswami v. Thetford, 829 S.W.2d 317, 321 (Tex. App.--El Paso 1992, writ
denied). Only rarely will an improper argument so prejudicially influence the jury
that the error cannot be cured. Standard Fire Ins. Co., 584 S.W.2d at 839; see Tex.
Employers' Ins. Ass'n v. Guerrero, 800 S.W.2d 859, 862-67 (Tex. App.--San
Antonio 1990, writ denied) (holding intentional appeal for verdict based on parties'
race or ethnicity is incurable); Howard v. Faberge, Inc., 679 S.W.2d 644, 649-50
(Tex. App.--Houston [1st Dist.] 1984, writ ref'd n.r.e.) (holding demonstration of
product's inflammability by counsel's attempt to ignite his arm during closing
argument was incurable when experiment was not cumulative of evidence adduced
during trial); In re W.G.W., 812 S.W.2d 409, 415-16 (Tex. App.--Houston [1st Dist.]
1991, no writ) (holding in custody dispute that attempt to link mother's cervical
cancer to immoral conduct was incurable because there was no evidence to support
such connection).

 Improper argument regarding the alleged wrongful conduct by a lawyer is not
per se incurable. As Texas courts have held, "charges that opposing counsel
manufactured evidence, suborned perjury, or was untruthful are highly improper and
are generally considered to be incurable." Yoakum, 826 S.W.2d. at 758 (emphasis
added). To determine whether a specific instance of accusing opposing counsel of
suborning perjury is incurable, we must examine all of the circumstances surrounding
the making of the statement to determine if the comment was so inflammatory that its
perceived prejudicial effect could not have been cured by an instruction to the jury. 
Standard Fire Ins. Co., 584 S.W.2d at 840.

 Under the facts of this case, House's comments were curable. To preserve
error, appellants should have timely objected to the comments and sought an
appropriate instruction from the trial court who, after listening to all of the evidence
and the offending comments and viewing the jury's reaction to the comments, was in
the best position to fashion the appropriate remedy for the transgression and punish
counsel for her conduct. Appellants should not have waited until after the jury had
returned with its verdict to seek relief for House's clearly improper argument.

 While House's comments were reprehensible, the comments were short in
duration and occurred at the very end of almost three weeks of trial after the jury had
heard all of the evidence, including evidence that clearly contradicted House's 
accusations of perjury. Although the record indisputably reveals that Valeriano did
testify differently when deposed during the suit between Superior and Republic and
later when JTI intervened in the suit against Republic and Rustin, Valeriano presented
the jury with an arguably legitimate explanation for the change in his position. (8) Thus,
the jury could have, with the proper instruction, found House's arguments to be
deliberately false and in bad faith. Furthermore, contrary to House's apparent
implications, the issue of the changed testimony was not dispositive of the jury's
determination of this case. This issue went to appellants' theory of damages, how
much appellants were entitled to recover, which the jury never reached per the court's
instructions. The changed testimony did not go to the issue of liability that was
reached by the jury--whether there was a breach of contract regarding CPI
adjustments and the requisite contractual percentage of income that appellants were
required to make under their contracts with Rustin. Of particular importance is the
fact that at no time did the trial court in any way condone or show approval for the
comments in front of the jury and thus its ability to issue a curative instruction was
not impaired. See Yoakum, 826 S.W.2d. at 758-59. Appellants' only objection was
immediately sustained by the court, and appellants elected not to pursue the matter
any further by requesting an instruction to disregard or a reprimand from the court.

 Under these facts, House's comments were not so inflammatory that their
perceived prejudicial effect would have prevented the jury from following its oath
with the proper instructions from the judge. Appellants could have requested the trial
court to instruct the jury that "the record does not show any post-deposition meeting
or conversations between Mr. Able [appellants' counsel], his retained accounting
experts, and Mr. Valeriano and to disregard any reference to such meeting or
conversations between any of them." Appellants could have gone further by asking
the trial court to instruct the jury that it was improper for House to impute
wrongdoing of any kind to appellants' counsel. The trial court, if it had been timely
requested to do so, could have also admonished House that any further argument
along such lines would result in a mistrial. In this case, the timely request for relief
regarding an imaginary post-deposition meeting or conversation would not have
prejudiced appellants' case in front of the jury. See General Motors Corp. v.
Iracheta, 161 S.W.3d. 462, 472 (Tex. 2005) (held comments before closing
arguments made in Spanish by party, not his counsel, directly to a Spanish speaking
jury were incurable.) 

 Appellants' reliance on the holdings in Yoakum and Stephens v. Smith, 208
S.W.2d 689 (Tex. Civ. App.--Waco 1948, writ ref'd n.r.e.) to support the conclusion
that House's comments constituted incurable error is misplaced. The facts of those
cases are clearly distinguishable from the facts in this case. In both of the cases in
which the appellate courts found allegations that counsel manufactured evidence at
trial to be incurable, the trial court, by its conduct, erroneously condoned or implied
to the jury that the conduct was proper. Accordingly, the trial court's ability to
fashion an appropriate instruction was impaired. In Yoakum, not only did the trial
court erroneously prevent counsel from arguing that allegations of manufactured
evidence by opposing counsel was error, but the offending counsel referred to the
trial court's rulings to bolster his allegations in front of the jury. Yoakum, 826
S.W.2d at 758. Likewise in Stephens, the court overruled attempts by opposing
counsel to correct the error of counsel's arguments that he "deliberately planted a lie
in the mouth of a witness." Stephens, 208 S.W.2d at 691. In other cases cited by
appellants, in which allegations that counsel manufactured and/or destroyed evidence
were found to be incurable, either additional facts impaired the trial court's ability to
give an effective curative instruction, or the length of the improper argument made
an effective curative instruction impossible. See Howsley & Jacobs v. Kendall, 376
S.W.2d 562, 566 (Tex. 1964) (held that counsel's comments were incurable when,
during closing argument, counsel asked the jury who was more likely to be telling the
truth--a man on his deathbed "about to come face to face with his Master" or "a
colored boy who had been under the coaching of this battery of lawyers, when he got
on there to give words that were not his words."); Montgomery Ward & Co. v.
Brewer, 416 S.W.2d 837, 845-48 (Tex. Civ. App.--Waco 1967, writ ref'd n.r.e.)
(held as incurable repeated accusations throughout closing argument that opposing
counsel had destroyed key evidence as to the issue of liability and the pointing
directly to counsel while making these accusations).

 Because we hold that the error was curable by an instruction, a prompt
withdrawal of the statement, or a reprimand by the trial court, the appellants were 
required to object, request an instruction to disregard, and request a motion for
mistrial. Standard Fire Ins. Co., 584 S.W.2d at 839. By failing to do so, appellants
have waived this error. Id. We overrule appellants' second issue.

Harm

 Finally, assuming that the error had been preserved, appellants must prove that
"the argument by its nature, extent, and degree constituted reversibly harmful error." 
Id. On appeal, we must evaluate the improper argument in light of the entire case,
from voir dire to closing arguments. Luna v. North Star Dodge Sales, Inc., 667
S.W.2d 115, 120 (Tex. 1984). The test is whether a juror of ordinary intelligence
would have been persuaded by the improper argument to agree to a verdict contrary
to that to which the juror would have otherwise agreed. See Tex. Employers Ins.
Ass'n v. Puckett, 822 S.W.2d 133, 136 (Tex. App.--Houston [1st Dist.] 1991, writ
denied). 

 We have reviewed the entire record, and we agree with the trial court's finding
that

 [t]he court has reviewed all of the evidence in the case supporting the
jury verdict and finds that there is more than sufficient evidence to
support the verdict. The court also notes that the inflammatory
argument was of short duration, was not repeated, and an objection to
the argument was promptly sustained. There was also evidence that Mr.
Valeriano's testimony did change. The court finds that the probability
that the jury verdict was grounded on proper evidence is greater than the
probability that the verdict was based on the improper argument. 


 Accordingly, we hold that the trial court did not err in denying appellants'
motion for new trial. See Standard Fire Ins. Co., 584 S.W.2d at 840 (for reversal,
must show probability that improper argument caused harm greater than probability
verdict grounded on proper proceedings and evidence). 

 We overrule appellants' second issue. 






Conclusion


 We affirm the judgment of the trial court.

 

 George C. Hanks, Jr.

 Justice


Panel consists of Justices Jennings, Hanks, and Higley.


Justice Jennings, dissenting.

1. During the pendency of this appeal, appellants dismissed Republic from the appeal. 
2. Valeriano prepared the financial statement by taking the income that he received from
the two transfer stations, calculating that income as a percentage of his total revenue,
and then applying that percentage to his costs. 
3. While the appellants do not specify the procedural vehicle whereby they preserved
their matter-of-law point on appeal, the record reflects that they filed a motion for
judgment notwithstanding the verdict ("JNOV") asserting that they were entitled to
a JNOV on their contract claim against Rustin for CPI adjustment increases. A
legal-sufficiency challenge may be preserved by a motion for directed verdict, a
motion for judgment notwithstanding the verdict, an objection to submitting an issue
to the jury, a motion to disregard a jury finding on an issue, or a motion for new trial. 
See Cecil v. Smith, 804 S.W.2d 509, 511 (Tex. 1991); C.M. Asfahl Agency v. Tensor,
Inc., 135 S.W.3d 768, 786 (Tex. App.--Houston [1st Dist.] 2004, no pet.).
4. Rustin's CFO, Jim Goodyear, agreed with the calculations from Greg Brown,
appellants' accounting expert, based on a July 1, 2001 effective date. However, he
took issue with the July 1, 2001 effective date. 
5. Sherwood testified that he was under the impression that, when Rustin got a rate
increase, JTI and Superior would get an increase, but he changed his understanding
when "it was pointed out to me in the contract." 
6. Linthicum testified that, "in our business, in the waste hauling business, all CPIs are
-- it is the burden of the person contracting the services to request CPIs, whether they
are increases or decreases. It is standard in the industry." 
7. Westpark actually opened on March 9, 2001, but it was easier to calculate from the
first of the month. 
8. At trial, Valeriano testified that, when he was deposed, he was under the impression
that the Westpark route was profitable. He had not evaluated the various routes
separately. Based on the line of questions posed to him during his deposition, he
determined that he needed to have an accountant audit the individual routes. He
testified at trial that, only after he was able to take the time to do so, he discovered
that the Westpark route was not, in fact, profitable.